**[Cite as *State v. Wilson*, 2022-Ohio-3763.]**

## IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## CLARK COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 2021-CA-68 |
| | : | |
| v. | : | Trial Court Case No. 2021-CR-371 |
| | : | |
| TYLER WILSON | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 21st day of October, 2022.

. . . . . . . . . . .

IAN A. RICHARDSON, Atty. Reg. No. 0100124, Assistant Prosecuting Attorney, Clark County Prosecutor's Office, Appellate Division, 50 East Columbia Street, Suite 449, Springfield, Ohio 45502
    Attorney for Plaintiff-Appellee

CARLY EDELSTEIN, Atty. Reg. No. 0095950, Assistant State Public Defender, Ohio Public Defender's Office, 250 East Broad Street, Suite 1400, Columbus, Ohio 43215
    Attorney for Defendant-Appellant

. . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Defendant-Appellant, Tyler Wilson, appeals from his conviction, after a jury trial, on one count of felonious assault in violation of R.C. 2903.11(A)(2), a felony of the second degree, along with a three-year firearm specification and a five-year firearm specification. The trial court imposed an indefinite sentence of eight to twelve years for felonious assault and ordered the firearm specifications to be served consecutively to the felonious assault term, for an aggregate sentence of 16 to 20 years.

{¶ 2} According to Wilson, trial counsel provided ineffective assistance by failing to ask for an instruction on self-defense and erroneously concluding that self-defense did not apply to the case. We disagree; the trial court properly performed its obligations and correctly found that Wilson had failed to provide sufficient evidence to justify a self-defense instruction. Settled descriptions of the nature of affirmative defenses involve concession of the prosecution's facts and independent or substantive matter exempting a defendant from liability. The defense also may not negate any elements of the charged crime. In this case, Wilson did not concede that the prosecution's factual claims were true; instead, he attempted to negate the elements of the crime with which he was charged. As a result, a self-defense instruction was not warranted on these facts, and trial counsel did not render ineffective assistance of counsel by failing to request such an instruction. Accordingly, the judgment of the trial court will be affirmed.

I. Facts and Course of Proceedings

{¶ 3} On June 15, 2021, an indictment was filed charging Wilson with felonious assault and the attendant specifications, as well as one count of attempted murder, in

violation of R.C. 2903.02(A), with two attendant firearm specifications. After Wilson pled not guilty, a one-day jury trial was held on October 26, 2021.

**{¶ 4}** The charges against Wilson arose from an incident that occurred on June 8, 2021, at a Shell gas station at the corner of Leffel Lane and South Limestone Street in Springfield, Ohio. The State presented several witnesses, including the victim, Billy Reffett, eyewitnesses to the crime, and police officers who investigated. Wilson testified on his own behalf and presented no other witnesses.

**{¶ 5}** The State's first witness, James Henry, testified that on June 8, 2021, he was working at the Shell station at the corner of Leffel Lane and South Limestone Street. Transcript of Proceedings ("Tr."), p. 73. Henry identified a June 8, 2021 video obtained from four surveillance cameras at the Shell station (State's Exhibit 28). The video was played for the jury. *Id.* at p. 74-79.

**{¶ 6}** Henry testified that the video reflected a male customer (later identified as Wilson), who left his vehicle at pump three and entered the store at around 6:58 a.m. *Id.* at p. 76 and 81-82. Henry waited on Wilson, who purchased food and wanted to buy cigarettes. However, Henry did not sell Wilson cigarettes because Wilson lacked identification. *Id.* at p. 77. Wilson left, then he reentered the store shortly after 7:03. At that point, Wilson tried to return the food he had purchased and instead use a food card to buy the food. Wilson again left the store less than a minute later and did not reenter. *Id.* at p. 77-79. During cross-examination, Henry stated that Wilson was not angry or agitated while in the store. *Id.* at p. 82-83.

**{¶ 7}** At around 7:11 a.m., a truck pulled up next to Wilson's car, and then backed

up. *Id.* at p. 75-76. Henry's daughter, Brianna, then came to the gas station to get gas and visit her father. She pulled up at pump one and was there at about 7:13 a.m. *Id.* at p. 77 and 97-98. A white vehicle (the car Wilson was driving) and a brown truck (Reffett's vehicle) were also there. *Id.* at p. 98. Brianna heard one person say, "you hit my car," and another one say, "No, I didn't." There was a bunch of name-calling. Brianna got out of her car to tell her father that people were arguing in the parking lot. When she got to the store's front door, she heard a big boom, which sounded like a gunshot. *Id.* at p. 99.

**{¶ 8}** Henry also heard gunfire and looked out of the window, trying to see where it came from. Tr. at p. 80. He then walked outside, but a truck obscured his view. When Henry walked around that vehicle, he saw Wilson getting in his white car, and Wilson and the gentleman in the truck went left. Maybe two minutes later, they turned around and were in a high speed chase. Henry called the police at around 7:26 a.m. *Id.* at p.77, 80, and 83.

**{¶ 9}** Reffett testified that he owns a tree company. On June 8, 2021, he and a passenger stopped at the Shell station for gas; they were on the way to Cincinnati to finish a job Reffett had scheduled for that day. *Id.* at p. 85 and 92. When Reffett pulled into the station, Wilson was in a car at pump three, and Reffett had to pull in between Wilson's car and another vehicle. *Id.* at p. 86. Reffett stated that, "Evidently, by me pulling in, I was pulling to the pump behind him [Wilson]. He must have thought I was too close to his vehicle." Both vehicles' windows were down, and Wilson spoke to Reffett. According to Reffett, "I didn't even finish pulling up to the pump. I put it in reverse.

Pulled back up beside his vehicle." *Id.* The men then began to "exchange words" about Reffett's proximity to Wilson's vehicle. *Id.* Reffett looked and did not think he was too close to the car; he felt Wilson said what he had for no reason. *Id.*

{¶ 10} Reffett testified that "[t]here was more stuff said" and then said:

It made me mad. I said, your car is a piece of sh* * anyways, and his [Wilson's] girl at the time at the window spoke up and said, you would feel bad actually if knew what happened to my car. I said, naw, actually I wouldn't, and that really pissed them off. He [Wilson] starts fumbling around.

I'm thinking like in my head, I'm thinking like, man, this dude ain't gonna pull up no gun or nothing. Seconds later, he pulled up a gun and instantly shoots at me. Instantly shoots at me out of his window at my head.

I, you know, I believe I already put it back in drive after I had backed and put it in reverse, so when he did that, you know, sh** happened so quick. I'm like, damn, he really shot at me. I pulled forward. He didn't take off instantly, you know, like I thought someone shot at me would. I do a U-turn in the parking lot. He's still sittin' at the pump at that second when I got turned around, so then he takes off, and I take pursuit chasing him.

Tr. at p. 87-88.

{¶ 11} The following exchange then occurred:

Q. * * * Did you show any weapons to him? Did you draw any

weapons on him?

Q. No.

Q. Did you have any weapons on you?

A. Sure didn't. I had tools in the back of the truck to go to work. Saws, chains. I was going to work.

Q. But you admit you were cussing at him, right?

A. Yes. * * *

Tr. at p. 88.

{¶ 12} Reffett testified that Wilson headed down Leffel Lane after leaving the Shell station. According to Reffett, Wilson "probably didn't think I was gonna chase him like I did. So once he noticed that, he quickly turns[,] did a U-turn at Bob Evans at that little bus area right there to jump on the highway so at that time, you know, I'm fumbling around. First time ever being shot at, you know what I mean? For no reason, for no reason. An argument. So I'm fumbling around trying to get 911." *Id.* at p. 89.

{¶ 13} Reffett was able to reach 911, and a recording of the call was played for the jury (State's Exhibit 33). *Id.* at p. 90. When asked how far away he was from the car Wilson was driving during the pursuit, Reffett said he "was a pretty good distance away. I mean, of course, I shouldn't have been going that fast, but the dude shot at me, man." *Id.* Ultimately, Reffett was able to get close enough to obtain a partial tag number for Wilson's car. *Id.* at p. 90-91 and State's Ex. 33.

{¶ 14} During the pursuit, which occurred mostly on Interstate 70, Reffett was traveling 90 miles an hour, trying to catch up with Wilson. At one point, Wilson exited

the eastbound interstate and immediately entered the interstate again, heading in the opposite direction, back toward where the shooting had occurred. Ultimately, Wilson slowed way down. While Reffett could have pulled up behind Wilson, he was concerned because of what Wilson had done. As a result, Reffett pulled off to the left side of the highway to be safer and have other traffic between them. Wilson then stopped his car and began backing down the highway in reverse and went to a turnaround to go east again. At that point, Reffett continued to travel westbound, as he had given the dispatcher a description of Wilson's vehicle, a partial license number, and the mile marker where Wilson was located. Tr. at p. 91, 135, 140-141, and Ex. 33.

{¶ 15} During the call, the 911 dispatcher told Reffett to go a Certified gas station to meet the police. Although Reffett went to that station, the police were not there yet, and it was not where the incident had happened. As a result, Reffett went back to the Shell station to pick up his friend (who had jumped out of the car because he was "scared to death"). *Id.* at p. 92. The two men then went to Cincinnati to finish their job. *Id.*

{¶ 16} On his way to work that morning, Detective Jordan of the Springfield Police Department heard the 911 call. Based on what Jordan heard, Reffett sounded very upset and very emotional, and Jordan thought if he could talk to Reffett one-on-one, he could get a better idea of what had happened. *Id.* at p. 114-116. After obtaining Reffett's phone number, Jordan called Reffett, who was still driving on the interstate and was still emotional. *Id.* at p. 116. Jordan told Reffett to focus on his driving and to continue where he was headed, and Jordan said he would talk to Reffett when he got to his job site. *Id.* Jordan then met with Reffett that afternoon, after Reffett returned from

Cincinnati. *Id.* at 92 and 116.

{¶ 17} In the meantime, when Wilson turned around on the interstate, his car ran out of gas. However, he managed to get off at the West Jefferson exit. Tr. at p. 136. At about 8:00 a.m., officers from West Jefferson and Madison County responded to Wilson's location. *Id.* at p. 106 and 109. At the time, the officers were unaware of what had taken place in Springfield. Officer Teders of West Jefferson believed that both individuals in Wilson's car were under the influence. *Id.* at p. 108. Wilson had misdemeanor warrants and was taken to jail, and Wilson's passenger was taken to the hospital for an injury. An inventory search of the car revealed a semi-automatic pistol in a black bag. *Id.* at p. 107, 110-112, 125, 128, and 143.

{¶ 18} Reffett arrived at the Springfield police station around 1:00 or 2:00 that afternoon, with the truck he had been driving. *Id.* at p. 92. The police took photos, which showed a dent on the window frame of the driver's side of the vehicle, at about the same height as Reffett's head. *Id.* at p. 92-95, 100-102, and 120-121, and State's Ex. 1-12 and 17. Based on the conversation with Reffett, Jordan and another detective went to the Shell station to look for evidence of a shooting and to show witnesses a photo lineup. *Id.* at p. 117. There, Jordan found "a piece of the jacketing from a projectile or bullet that was lying on the parking lot several feet next to pump three." *Id.* at p. 118-119, and State's Ex. 15 and 16.

{¶ 19} Reffett identified State's Exhibit 4 as a photograph of himself in his truck and the dent, which showed how close the bullet came to hitting his head. *Id.* at p. 94. Reffett stated that the dent had not been there previously. *Id.*

{¶ 20} After the State rested, Wilson testified. His testimony was as follows. On June 8, 2021, Wilson was driving the car of a friend, Alaina Drugroyal. At around 7:00 a.m., they stopped at the Shell station for gas, donuts, and milk. Tr. at p. 124 and 127. Alaina was from Florida, and Wilson was aware that she had a gun in her car. He had discovered this a day or two before, when Alaina came up from Florida. *Id.* at p. 127-128. According to Wilson, Alaina had the gun for protection because she was a single female traveling across the country by herself. *Id.* at p. 128.

{¶ 21} When Wilson returned from the store to the car, "Mr. Reffett came pulling in, about clipped us, and like I was worried about it." *Id.* at p. 126. The car windows were down because it was warm. *Id.* at 126-127. At that point, Wilson said, "Man, what the hell? You almost hit me." *Id.* at p. 127. Reffett had already driven past, so he hung out his window and said, "what did you say, bitch?" *Id.* Reffett then backed right up to Wilson's window. According to Wilson, he was already on guard because this stranger had pulled back up to him. *Id.* Reffett was so close that Wilson could not even open his door to get out. *Id.* at p. 129.

{¶ 22} Alaina's car sat lower than Reffett's truck, and Reffett was a couple feet away, "spitting in [Wilson's] face" and yelling at him aggressively. *Id.* Reffett had a buddy with him, and they acted like they were going to jump on Wilson. Wilson argued back, stating, "I'm not scared of you. I'll beat you both up one on one." *Id.* Wilson also told Reffett to back up, that he was not playing with him. *Id.* According to Wilson, at that point, Reffett said, "what you gonna do? I'll smoke you out here." *Id.* Reffett then raised a gun at Wilson. *Id.*

**{¶ 23}** The following exchange then occurred:

Q.   So what did you do when you saw this?

A.   I was scared for my life.

Q.   So what did you do?

A.   I grabbed the gun, which I knew where it was at and did the only thing I knew.   I'm not experienced with guns either.   I grabbed that as fast as I could and just up and fired.   I didn't aim at the vehicle at all, but he was so close to me it couldn't do nothing but probably hit there.

I don't think that bullet hole was even from me.   That wasn't even a bullet hole.   That dent.   That close.   I just aimed out the window and fired up.

Q.   Did you intend to strike him?

A.   No.   I intended to scare him and back him off because that man had a gun to me, either way he had a gun to me, so instinct, I grabbed that as fast as I could to protect me and her.

Q.   So it looked like he pulled away from you, circled around, and his passenger got out, correct?

A.   I didn't see his passenger get out, but the video shows the passenger getting out so when he was behind me, I thought it was both of them still, so I figured they either had more artillery than me, you know, maybe not just one gun but two guns, and two males after me, I did, man, I had to go.

I looked back. He pulled around. He must have dropped dude off. I looked back. I'm trying to start the car. That's why I was there still.

Q. You sat there for like 30 seconds?

A. Yes.

Q. Why did you do that?

A. Because the car was hesitating to start. My luck. * * * I looked back and this man let dude out, and it looked like he was gonna come after me, which he did. He proceeded to come after me. It finally started and got me out of there. You see he still almost got us, and I wish you got more video from around there.

But this man was literally trying to ram me off the road. You heard on that 911 call that was [sic] man after me. I was running for my life. There was only one shot out the window. Nobody got hit. I didn't intend to hurt or touch or kill nobody at all.

Q. So why did you get up to 80 or 90 miles an hour?

A. I was running for my life.

Q. Why did you back up on the highway?

A. I was running for my life.

Q. At any time during that chase did he show you a gun again?

A. Man, actually the girl, when we were getting onto the highway, she said, baby, look. I looked in the rearview, and she was scared to death. Man, that girl was scared to death. I looked in the rearview. I was too for

real.   * * *

I looked in the rearview and that truck is right on my ass with a gun out the window.   I don't know whether he had 911 on speaker.   I mean, I was trying to think how he was hanging the gun out the window and being on the phone at the same time, but I seen [sic] it out the window in the rearview mirror.

Tr. at p. 130-132.

{¶ 24} Wilson stated that his criminal history included "a lot of miscellaneous, low felony drug charges" but that he had never been convicted of domestic violence, assault, or weapons charges.   *Id.* at p. 133.   After Wilson described being pursued by Reffett, the following exchange occurred:

Q.   So when you were back at the gas station, at any time did you try to shoot Billy [Reffett]?

A.   Excuse me?

Q.   Did you intend to shoot Billy at that time?

A.   No.

Q.   Did you intend to murder him?

A.   All I wanted to do was make noise to get him out of my face. That man had a gun to me, and I don't even know how.   I got one shot out of the vehicle and it did its job for real.   He got away from me, and the car wouldn't start or I would have had a little more time to get away.

Tr. at p 136.

{¶ 25} Later, during cross-examination, the following exchange occurred:

Q.   You admit that that was you that fired that shot, correct?

A.   I admit to firing a shot.

Q.   You admit firing that shot from this gun?

A.   I believe so.

Q.   You admit that you were in your car when you fired that shot?

A.   I was in the car.

Q.   You were in the car.   You admit you aimed it at him.

A.   No.

Q.   Do you agree that the bullet hit about half of an inch from his head?

A.   I don't.   And you're saying that the trajectory from that shot was aimed at his head.   I'm not sure that was even a bullet hole to begin with.   Let's just say it was.   Let's say it was now and - -

Q.   Well, you fired your gun at him, right?

A.   No.   Let's just say, hold on.

Q.   You fired your gun at him.

A.   Are you gonna let me finish?

Q.   I'm gonna ask you the questions, and you're gonna answer.

A.   Yes, sir.

Q.   Did you fire your gun at him?

A.   I fired her gun in the air.

Q. Did you hear a noise where it struck the truck?

A. No.

Q. Did you see the mark right by Mr. Reffett's head?

A. You guys had him sit back in his seat to make it look like it was in line with his head, when, in fact, he was hanging out his window. In the middle of his window. That's a couple feet from his head. That's a big difference from a direct line to his head.

* * *

Q. I'll show you State's Exhibit # 7. That's one where we seen [sic] Mr. Reffett there with that circular hole or dent right by his head. Do you see that?

A. Yes.

Q. Now, you're saying that you shot at him but - -

A. I didn't shoot at - -

Q. - - you didn't cause that dent right by that - -

A. I shot out of my window to make noise. This dent right here, if he was in full confrontation with me, his face would be in the middle of the window, hanging out of it. Even if he wasn't hanging out of it and he would be looking towards me, there's no way he's sitting back in his seat like (indicating) this, like you took this picture behind him.

Tr. at p. 137-139 and 143-144.

{¶ 26} After the defense rested and the jurors left the courtroom, the following

exchange occurred:

> THE COURT:    * * * Before we get to closing arguments I did want to address an issue with respect to jury instructions.   I want to state the way I view the evidence and then I'll let counsel comment on that and make whatever argument you'd like with respect to whatever jury instructions you think should apply.
>
> At first I thought we were looking at a self-defense case, but the more I heard the defendant testify, I believe that the defense in this case is that the defendant did not aim the gun at the victim, did not intend to hurt the victim or kill the victim.
>
> His testimony was that he fired the gun in the air to scare them off. So to me, that's the defense.
>
> Now, that being said, because of that I don't think a self-defense instruction is warranted, but I certainly think the defense has every right to argue that the reason he fired the shot in the air was because he was afraid perhaps for his life.
>
> I don't have a problem with that argument.   But I don't see it as a true self-defense case because he's saying he didn't fire the shot at the victim.
>
> Is that how you see it, [both counsel]"?
>
> [DEFENSE COUNSEL]:   Yes.
>
> [THE PROSECUTOR]:   I agree, yes.

[DEFENSE COUNSEL]: I agree too.

THE COURT: * * * So I don't want to prevent the defense in any way from arguing that the defendant was afraid for his life and that's the whole reason why he grabbed the gun and fired it.

But again, I think the defense from that point is that I fired the gun into the air to scare them off, which * * * doesn't really fit with a true self-defense claim. But again, [Defense Counsel], I will give you the full latitude to argue essentially what the defendant's testimony was.

[DEFENSE COUNSEL]: I believe that's accurate. You described it.

THE COURT: * * * That's the way I saw it. * * * So I won't put a self-defense in the jury instructions but again, I think there's a component of self-defense in this, so I will let counsel argue that point to whatever extent you want.

Tr. at p. 145-147.

{¶ 27} During the State's closing argument, the prosecutor asserted that Wilson had "attempted to kill Billy Reffett and he did so using a firearm." The prosecutor also argued that "it was an intention when you point a gun at someone's head and you pull the trigger, the reasonable consequences of that is, a bullet is coming out of the other end of the gun. When you're aiming it, you miss by that (indicating) much, I don't think there's any question what his purpose was." Tr. at p. 149 and 150.

{¶ 28} In contrast, defense counsel asserted, in part, as follows:

There is no proof to show that he committed the crimes that he's charged with. He didn't really act in self-defense. Self-defense would be if he tried to shoot somebody. That's true self-defense. There is a bearing there of self-defense, but he was acting more of himself than others when he shot in the air.

He wasn't shooting at the person, so that's not true self-defense. There is an element there, but that's why you need it. That's what you need to think about. He did not intend to murder, did not intend to hit. He tried to ward off and scare, and get out of that situation, and that's why he took off and was pursued by a man with a gun that was waving it out the window.

* * *

So when go you go back there and deliberate, I just want to point out that the State has not met its burden. He did not attempt to hurt or murder anybody. He shot in the air in defense of himself and his passenger.

Tr. at p. 155-156.

{¶ 29} After hearing the evidence, the jury found Wilson not guilty of attempted murder and guilty of felonious assault and the attendant gun specifications, and he was sentenced accordingly. With this background in mind, we will consider Wilson's sole assignment of error.

## II. Ineffective Assistance of Counsel

{¶ 30} Wilson's assignment of error states that:

Trial Counsel Provided Ineffective Assistance of Counsel by Failing to Ask That the Jury Be Instructed on Self-Defense and Erroneously Concluding that Self-Defense Does Not Apply to the Facts and Circumstances of Mr. Wilson's Case.

{¶ 31} Wilson contends that while this is not a classic self-defense case, his encounter with Reffett caused him to fear for his life.  Thus, while Wilson "did not shoot the firearm with the intent to kill or injure, he acted with the intent to protect himself and Ms. Drugroyal and satisfied his burden of production on each of the self-defense elements."  Wilson Brief at p. 10.  In addition, Wilson argues that failing to request a self-defense instruction in such a situation "constitute[d] deficient performance [by counsel] and cannot be said to reflect reasonable trial strategy."  Id.  According to Wilson, defense counsel "was operating under the uninformed impression that Ohio law does not permit a self-defense instruction where a defendant fires a warning shot rather than shooting to kill or injure."  Id. at p. 11.  Wilson also argues that "without making any argument or providing any case law, trial counsel merely acquiesced to the position of the trial court and prosecution that self-defense does not apply to an intentional and erratic warning shot."  Id.

{¶ 32} Furthermore, Wilson argues that, although Ohio prohibits self-defense where a defendant claims innocence and a weapon is accidentally discharged, warning shots are different because they are intentional.  From this perspective, self-defense instructions must be given where a defendant, as here, claims to have feared for his life,

was unable to retreat, and was not responsible for creating the situation. Consequently, because Wilson's testimony presented these facts, a jury could have concluded, with proper instruction, that he acted in self-defense.

{¶ 33} In response, the State contends that warning shots cannot support the necessary element of force for self-defense. The State further notes that Wilson's trial counsel followed a legitimate trial strategy to avoid having to admit that Wilson directed force against Reffett. Finally, the State argues that because warning shots are not forces actually directed at an aggressor, they cannot satisfy the elements of the affirmative self-defense provided in R.C. 2901.05.

{¶ 34} Before addressing these points, we will outline the standards that apply to ineffective assistance of counsel.

## A. Ineffective Assistance of Counsel

{¶ 35} "A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "An error by counsel, even if professionally unreasonable, does not

warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691.

{¶ 36} "To show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *State v. Bradley*, 42 Ohio St.3d 136, 137, 538 N.E.2d 373 (1989), paragraph three of the syllabus. *See also Strickland* at 696. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland* at 694.

{¶ 37} In *Strickland*, the court stressed that "[j]udicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. * * * A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Id*. at 689, quoting *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955).

{¶ 38} With these standards in mind, we will consider whether trial counsel was

ineffective in failing to ask for a self-defense instruction.

## B. Discussion

{¶ 39} Having considered the law and evidence, we conclude that Wilson's trial counsel did not render ineffective assistance of counsel, because a self-defense instruction was not warranted under the facts of this case.

{¶ 40} "After arguments are completed, a trial court must fully and completely give the jury all instructions which are relevant and necessary for the jury to weigh the evidence and discharge its duty as the fact finder." *State v. Comen*, 50 Ohio St.3d 206, 553 N.E.2d 640 (1990), paragraph two of the syllabus. "A court's jury instructions must be based on the actual issues in the case as presented by the evidence. * * * Thus, a court should not give an instruction unless it is specifically applicable to the facts in the case." *State v. Scimemi*, 2d Dist. Clark No. 1994-CA-58, 1995 WL 329031, *6 (June 6, 1995), citing *State v. Guster*, 66 Ohio St.2d 266, 421 N.E.2d 157 (1981). To decide if a self-defense instruction is warranted, "the trial court must determine 'whether the defendant has introduced sufficient evidence, which, if believed, would raise a question in the minds of reasonable men concerning the existence of such issue.' " *Id.*, quoting *State v. Melchior*, 56 Ohio St.2d 15, 381 N.E.2d 195 (1978), paragraph one of the syllabus. "Generally, the failure to request jury instructions is purely a matter of trial tactics and will not be disturbed upon review." *State v. Herrington*, 9th Dist. Summit No. 25150, 2010-Ohio-6455, ¶ 11, citing *State v. Clayton*, 62 Ohio St.2d 45, 47-49, 402 N.E.2d 1189 (1980).

{¶ 41} Before discussing this point in detail, we will consider recent amendments

to Ohio's self-defense statute, R.C. 2901.05, to see if they have changed settled law about when instructions on self-defense are appropriate.

{¶ 42} As noted, Wilson argues that trial counsel rendered ineffective assistance of counsel by failing to argue for a self-defense instruction. The trial court rejected self-defense, stating that while a "component of self-defense" existed, Wilson's defense was that he "did not aim the gun at the victim, [and] did not intend to hurt the victim or kill the victim," which did not fit a true self-defense claim. Tr. at p. 146.

{¶ 43} The trial court's decision was consistent with *State v. Poole*, 33 Ohio St.2d 18, 294 N.E.2d 888 (1973), in which the Supreme Court of Ohio said that:

> This court has consistently recognized that there are certain "justification(s) for admitted conduct" allowed to a defendant in a criminal case, provable for the most part under the plea of not guilty, which are referred to as "affirmative defenses." As characterized by one authority, they represent not a mere denial or contradiction of evidence which the prosecution has offered as proof of an essential element of the crime charged, but, rather, they represent a substantive or independent matter "which the defendant claims exempts him from liability even if it is conceded that the facts claimed by the prosecution are true."

(Footnotes omitted.) *Id.* at 19, quoting McCormick, *Evidence*, Section 801 (2d Ed.), and Anderson, 1 *Wharton's Criminal Evidence*, Section 19, at 54 and 55 (12 Ed.). At the time, in these situations (which included self-defense), the defendant had to prove the affirmative defense "by a preponderance of the evidence." *Id.*, citing *State v. Vargo*, 116

Ohio St. 495, 507, 156 N.E. 600 (1927).

{¶ 44} Our court has also commented that "[n]on-affirmative defenses seek to negate the state's proof of an element * * *. * * * Since the burden to prove all the elements of an offense beyond a reasonable doubt rests on the state – and never shifts – no part of an affirmative defense may negate an element of the offense."  *State v. Ellis*, 2d Dist. Montgomery No. 24003, 2011-Ohio-2967, ¶ 28, citing *Poole* at 19, and *State v. Nucklos*, 171 Ohio App.3d 38, 2007-Ohio-1025, 869 N.E.2d 674, ¶ 38 (2d Dist.) (Other citations omitted.)

{¶ 45} When *Poole* was decided in 1973, R.C. 2901.05 was not yet in effect, and Ohio followed common law rules concerning self-defense.  The first version of R.C. 2901.05, which was enacted in 1974, changed the common law burden of proof by providing that " ' "[e]very person accused of an offense is presumed innocent until proven guilty beyond a reasonable doubt, and the burden of proof is upon the prosecution.  The burden of going forward with the evidence of an affirmative defense is upon the accused." ' "   *State v. Brooks*, Ohio Slip Opinion No. 2022-Ohio-2478, __ N.E.3d __, ¶ 17, quoting *State v. Humphries*, 51 Ohio St.2d 95, 98, 364 N.E.2d 1354 (1977), which in turn quoted former R.C. 2901.05(A).

{¶ 46} The 1974 version of the statute did not exist for long.  "Effective November 1, 1978, R.C. 2901.05(A) was amended to read that, '(e)very person accused of an offense is presumed innocent until proven guilty beyond a reasonable doubt, and the burden of proof for all elements of the offense is upon the prosecution.  The burden of going forward with the evidence of an affirmative defense, and the burden of proof, by a

preponderance of the evidence, for an affirmative defense, is upon the accused.' " *State v. Jones*, 67 Ohio St.2d 244, 247, 423 N.E.2d 447 (1981), *reversed on other grounds, State v. Webb*, 70 Ohio St.3d 325, 638 N.E.2d 1023 (1994), paragraph one of the syllabus. Thus, the burdens reverted to what the common law had dictated.

{¶ 47} R.C. 2901.05 remained in that form until 2018, when it was amended significantly to make changes in the burdens relating to self-defense. *Brooks* at ¶ 13. At that point, the law was amended to "modify the law governing * * * the grounds for self-defense and the burden of proof." Am.Sub.H.B. 228, 2018 Ohio Laws 159. According to the Bill Analysis, the amendment "[s]hifts to the state the burden to prove beyond a reasonable doubt that a person charged with an offense that involved the use of force against another did not use that force in self-defense, defense of another, or defense of that person's residence" and "[r]equires that a person charged with an offense present evidence that tends to support that the accused acted in self-defense, defense of another, or defense of that person's residence." Ohio Legislative Service Commission Bill Analysis for Sub.H.B. 228, p. 2 (Dec. 7, 2018). Thus, the law returned essentially to what it had been in 1974. "The only thing that the amendments to R.C. 2901.05 changed is which party has the burden of proving or disproving a self-defense claim at trial." *Brooks* at ¶ 15.

{¶ 48} R.C. 2901.05 was amended again in 2020, with the changes being effective on April 6, 2021. *See* Am.S.B. 175, 2020 Ohio Laws 78. The most recent version of the statute would apply here, because Wilson's crimes were committed on June 6, 2021, which was after the effective date of the amendments. However, these amendments

were not substantive and would not affect any relevant issues here.   *See* Am.S.B. 175, 2020 Ohio Laws 78, and Ohio Legislative Service Commission, Final Bill Analysis, p. 2 (Jan. 21, 2021).

{¶ **49**} The most current version of R.C. 2901.05 provides that:

(A) Every person accused of an offense is presumed innocent until proven guilty beyond a reasonable doubt, and the burden of proof for all elements of the offense is upon the prosecution.   The burden of going forward with the evidence of an affirmative defense, and the burden of proof, by a preponderance of the evidence, for an affirmative defense *other than self-defense*, defense of another, or defense of the accused's residence presented as described in division (B)(1) of this section, is upon the accused.

(B)(1) A person is allowed to act in self-defense, defense of another, or defense of that person's residence.   If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense, defense of another, or defense of that person's residence, the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense, defense of another, or defense of that person's residence, as the case may be.

(Emphasis added.)

{¶ **50**} *Poole* was decided in 1973, before R.C. 2901.05 was first enacted, and was

based on the common law. Thereafter, regardless of the version of R.C. 2901.05 in effect, courts used settled descriptions of the nature of affirmative defenses, which involved concession of the state's facts, independent or substantive matter exempting a defendant from liability, and the fact that the defense may not negate any elements of the crime. *E.g., Poole*, 33 Ohio St.2d at 19, 294 N.E.2d 888; *Walden v. State*, 47 Ohio St.3d 47, 50, 547 N.E.2d 962 (1989); *State v. Martin*, 21 Ohio St.3d 91, 94, 488 N.E.2d 166 (1986), *superseded by statute as noted in Brooks*, Ohio Slip Opinion No. 2022-Ohio-2478, __ N.E.3d __, at ¶ 15; *State v. Armstrong-Carter*, 2d Dist. Montgomery No. 28571, 2021-Ohio-1110, ¶ 33; *Ellis*, 2d Dist. Montgomery No. 24003, 2011-Ohio-2967, ¶ 28; *State v. Henderson*, 2d Dist. Montgomery No. 28975, 2021-Ohio-3943, ¶ 24; *State v. Petway*, 2020-Ohio-3848, 156 N.E.3d 467, ¶ 45 (11th Dist.); and *State v. Mallory*, 10th Dist. Franklin No. 08AP-942, 2009-Ohio-2401, ¶ 26.

**{¶ 51}** A decision the Supreme Court of Ohio issued when considering the 1974 version of R.C. 2901.05 is also instructive. In *State v. Robinson*, 47 Ohio St.2d 103, 351 N.E.2d 88 (1976), the court noted that commentators and courts had "increasingly recognized" the "ambiguous and confusing" nature of the term "burden of proof." *Id.* at 106-107. This term had been used in two different senses: (1) "the burden of going forward with or producing evidence"; and (2) the "burden of persuasion." *Id.* at 107. After discussing the respective meanings of these terms in both civil and criminal cases, the court rejected the State's contention that the 1974 amendments had only partially codified a common law principle, such that defendants still retained "the common law burden of proving self-defense by a preponderance of the evidence." *Id.* at 110. In

this regard, the court said that:

>The obvious meaning of R.C. 2901.05(A) is that the state bears the burden of proof beyond a reasonable doubt through the trial, and that the burden not shift to the defendant.   In order to raise an affirmative defense, which is now statutorily defined as either "a defense expressly designated as affirmative" or "a defense involving an excuse or justification peculiarly within the knowledge of the accused, on which he can fairly be required to adduce supporting evidence" (R.C. 2901.05(C)), evidence of a nature and quality sufficient to raise the issue must be introduced, from whatever source the evidence may come.   The procedural steps to be taken by the trial court are well stated in *State v. Millett*, supra (273 A.2d at 508):

>" * * * When such evidence is forthcoming the trial court must first, viewing that evidence in the light most favorable to the defendant, determine whether or not it is adequate to raise the self-defense issue, and, if believed, would under the legal tests applied to a claim of self-defense permit a reasonable doubt as to guilt, stemming from that claim, to arise.   Having concluded as a matter of law that the self-defense issue is thus properly tendered, the trial court need only instruct the jury as to the elements of self-defense.   He will have no occasion to speak of burden of proof other than to explain the State's burden of proving guilt beyond a reasonable doubt. If the evidence adduced, so viewed, is legally insufficient to raise the issue, the trial court will have no occasion or obligation to instruct the jury on the

elements essential to a valid claim of self-defense, but rather will remove the issue of self-defense from jury consideration."

*Id.* at 110-113, quoting *State v. Millett*, 273 A.2d 504, 508 (Me.1971).

{¶ 52} In light of the consistent interpretation of the nature of self-defense claims, the trial court properly performed its obligation and correctly found that Wilson had failed to provide sufficient evidence to justify a self-defense instruction. Specifically, Wilson did not concede that the prosecution's factual claims were true; instead, he attempted to negate the elements of the crime with which he was charged.

{¶ 53} Wilson was charged with attempted murder in violation of R.C. 2903.02(A), felonious assault in violation of R.C. 2903.11(A)(2), and firearm specifications. He was convicted of felonious assault and the firearm specifications. Because Wilson was acquitted of attempted murder, no possible ineffective assistance of counsel could have occurred in connection with that verdict. As a result, we will only discuss the elements of felonious assault.

{¶ 54} The elements of felonious assault are as follows:

(A) No person shall knowingly do either of the following:

* * *

(2) Cause or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordnance.

{¶ 55} Under R.C. 2901.22(B), "[a] person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when

the person is aware that such circumstances probably exist."

{¶ 56} By his own admission, Wilson did not try to cause or attempt to cause harm to another. To the contrary, he specifically denied that he had intended to shoot Reffett or to hurt or kill anyone. Tr. at. p. 131. Since R.C. 2903.11(A)(2) requires that a defendant knowingly cause or attempt to cause harm to another by means of a deadly weapon, Wilson's denial of any such attempt is inconsistent with a claim of self-defense, and no self-defense instruction would have been appropriate.

{¶ 57} Furthermore, as the State notes in its brief, Wilson also did not use force against Reffett or anyone else, as that term is defined in R.C. 2901.01(A)(1), because, again, by his own admission, Wilson's warning shot was not "violence * * * physically exerted by any means upon or against a person or thing." State's Brief, p. 6. "Force," as used in the Ohio Revised Code, "means any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1). Because Wilson stressed that he did not shoot at anyone, the warning shot was not exerted upon or against a person.

{¶ 58} In arguing that self-defense applies, Wilson has relied on a Florida appellate case. *See* Wilson Brief at p. 12-13, citing *Miller v. State*, 613 So.2d 530 (Fla.App.1993). Before discussing this point, we note our observation in *State v. Grant*, 2d Dist. Darke No. 2019-CA-13, 2020-Ohio-3055, that " '[g]enerally, the failure to request jury instructions is purely a matter of trial tactics and will not be disturbed upon review.' " *Id.* at ¶ 27, quoting *State v. Herrington*, 9th Dist. Summit No. 25150, 2010-Ohio-6455, ¶ 11. (Other citation omitted.) Therefore, we begin with that principle in mind.

**{¶ 59}** In *Grant*, our court "found counsel ineffective for failing to request self-defense instructions because there was some evidence presented in each case upon which jurors could have found the defendant acted in self-defense." *Id*. However, the three cases that *Grant* referenced (where self-defense instructions were given), all involved situations where the defendant actually physically assaulted the victim. In one case, the defendant hit the victim; in another, the defendant "shoved the victim and also pushed the victim into a wall" and "hit, bit and slapped the victim." *Grant* at ¶ 27, citing *State v. Brown*, 2017-Ohio-7424, 96 N.E.3d 1128, ¶ 14 (2d Dist.), and *State v. Patterson*, 2d Dist. Greene No. 2015-CA-57, 2016-Ohio-2750, ¶ 7. In the third case, "the defendant testified that he used force to remove his perceived attacker's hand from his face." *Id*., citing *State v. Fritz*, 163 Ohio App.3d 276, 2005-Ohio-4736, 837 N.E.2d 823, ¶ 23 (2d Dist.). Clearly, in these cases, the defendants were not negating the elements of the crimes with which they had been charged; they admitted they struck the victims, but claimed their actions were done in self-defense.

**{¶ 60}** In *Grant*, we found that the defendant, who had attacked the victim with his cane and attempted to hit the victim with a hammer, was not entitled to a self-defense instruction. *Grant*, 2d Dist. Darke No. 2019-CA-13, 2020-Ohio-3055, at ¶ 20-21. We reasoned that the defendant's "trial strategy was based upon the claim that he was not physically involved in the altercation and never hit [the victim]. This theory of the case suggests that he did not act knowingly and did not cause physical harm to [the victim]. Such a strategy is inconsistent with self-defense, which concedes that the defendant had the purpose to commit the act but asserts that he was justified in his actions. In other

words, [the defendant] could not have been acting in self-defense if, as he claims, he did not act at all." *Id.* at ¶ 20. We rejected the ineffective assistance of counsel claim (based on failure to request a self-defense instruction) for the same reason. *Id.* at ¶ 28. The case before us is similar to *Grant*, in that Wilson attempted to negate the elements of the charged crimes, and his actions were inconsistent with self-defense.

{¶ 61} *State v. Hubbard*, 10th Dist. Franklin No. 11AP-945, 2013-Ohio-2735, has facts similar to the case before us. In *Hubbard*, the defendant's daughter and a neighbor had several altercations throughout the day. That evening, while the defendant, his daughter, and her friends were inside the house, the neighbor and a friend came down the street and threw a cement block through the front window. The defendant then came outside onto his porch and fired a gun, resulting in the death of one person and injury to another. A witness testified that the defendant had shot the gun toward a crowd of people who were down the street and that no one had been in front of the defendant's house when he shot. *Id.* at ¶ 3-5 and 8. In contrast, the defendant testified that he had fired a shot to "warn" people to back up, and that he "fired his gun 'down towards the ground' in the direction of the abandoned house immediately north from his house and in the vicinity of a green trash can sitting in front of the abandoned house. * * * Defendant explained that he did not intend to kill or harm anyone when he shot his gun." *Id.* at ¶ 7.

{¶ 62} After being convicted of attempted murder, felonious assault, murder, and firearm specifications, the defendant appealed. Among the assignments of error was a claim that the trial court had erred in refusing to instruct the jury on self-defense. *Id.* at ¶ 47. The Tenth District disagreed, stating that "[a] defendant claiming self-defense

'concedes he had the purpose to commit the act, but asserts that he was justified in his actions.' * * * Thus, when an individual testifies that they did not intend to cause harm, such testimony prevents the individual from claiming self-defense." *Id.* at ¶ 54, quoting *State v. Barnd*, 85 Ohio App.3d 254, 260, 619 N.E.2d 518 (3d Dist.1993). (Other citations omitted.)

{¶ 63} The facts in *State v. Collins*, 10th Dist. Franklin No. 19AP-373, 2020-Ohio-3126, are also similar to *Hubbard* and to our case. In *Collins*, the court commented that:

> In the instant case, appellant testified on direct examination that he fired the first shot "towards the ground" in order to "get [Bonet] [the victim] away so I could run back inside my house and call the police." (Tr. at 545.) He further averred that after Bonet started running away, he fired three more shots to "get [Bonet] at least to the other side of Deshler, far enough for me to run back up through the middle of the houses and back inside the house through the back." *Id.* at 547. On cross-examination, he admitted that he intentionally fired his weapon four times in Bonet's direction; however, he denied that he was trying to shoot him. Rather, he "was trying to shoot near him to scare him off with the gunshots." *Id.* at 561. He also stated that he "was trying to shoot at the ground by him but not directly at him." *Id.* at 563. As in *Hubbard*, appellant's testimony that he did not fire his gun with the intention of harming Bonet prevented him from claiming that he fired his gun in self-defense.

*Id.* at ¶ 36.

{¶ 64} According to the dissent, *Hubbard* is based on faulty reasoning because a case it cited involved an accident. The dissent also notes that some other cases we have cited also involved accidents. However, whether a situation involves an accident or a deliberate act misses the point. The reason *Hubbard* and other courts have rejected self-defense is because the defendants claimed they did not intend to harm the victim. This is inconsistent with a self-defense claim, where a defendant " 'concedes he had the purpose to commit the act, but asserts that he was justified in his actions.' " *Hubbard* at ¶ 54, quoting *Barnd* at 260.

{¶ 65} Cases from the Eighth District Court of Appeals have also followed the well-established principle that "[b]ecause self-defense presumes an intentional, willful use of force, ' " 'when an individual testifies that they did not intend to cause harm, such testimony prevents the individual from claiming self-defense.' " ' " *State v. Travis*, 8th Dist. Cuyahoga No. 110514, 2022-Ohio-1233, ¶ 26, quoting *Hubbard* at ¶ 54. *See also State v. Dixon*, 8th Dist. Cuyahoga No. 110972, 2022-Ohio-2582, ¶ 24; *State v. Davis*, 8th Dist. Cuyahoga No. 109890, 2021-Ohio-2311, ¶ 38. In *Davis*, the court further noted that "[s]elf-defense presumes that the facts of the crime, as alleged in the indictment or complaint, are true, but asserts that there are further facts that justify the defendant's actions and exempt him or her from liability." *Id*. at ¶ 39, citing *Poole*, 33 Ohio St.2d at 18-20, 294 N.E.2d 888.

{¶ 66} According to the dissent, self-defense is judged on a case's facts rather than "the charges the State elects to bring and must prove." However, as noted, the established principle is that "a defendant claiming self-defense does not seek to negate

an element of the offense." *State v. Dykas*, 185 Ohio App.3d 763, 2010-Ohio-359, 925 N.E.2d 685, ¶ 18 (8th Dist.). *See also State v. Gardner*, 8th Dist. Cuyahoga No. 110606, 2022-Ohio-381, ¶ 21; *Cleveland v. Williams*, 8th Dist. Cuyahoga No. 81369, 2003-Ohio-31, ¶ 10. Thus, the charges the State elects to bring, and their elements, are significant. Again, Wilson's self-defense claim did seek to negate an element of his offense, and the trial court, therefore, did not err in rejecting an instruction on self-defense.

{¶ 67} As to *Miller*, 613 So.2d 530, it was a brief per curiam decision and did not address the same issues as the case before us. Furthermore, "no court in this state is bound by a decision of another state court applying that state's own law." *Solomon v. Cent. Trust Co. of Northeastern Ohio*, 63 Ohio St.3d 35, 41, 584 N.E.2d 1185 (1992). *See also State ex rel. Yost v. Volkswagen Aktiengesellschaft*, 2019-Ohio-5084, 137 N.E.3d 1267, ¶ 30 (10th Dist.). We find no reason to follow the decision in *Miller*.

{¶ 68} The issue in *Miller* was whether the trial court erred in instructing the jury on the justifiable use of deadly force rather than on the justifiable use of non-deadly force. *Miller* at 531. The court of appeals found that firing a warning shot in the air involved the use of deadly force as a matter of law, because a firearm is a deadly weapon and can cause harm when fired in the vicinity of people. *Id.* However, the court did not address whether the defendant's position was an attempt to negate the elements of the crime or whether his denial of an attempt to harm was inconsistent with assertions of self-defense. The court likely focused on deadly force because in Florida, courts consider which type of instruction to give juries based on whether force is deadly or non-deadly.

{¶ 69} Other than amendments implementing neutralizing gender changes in

1997, Florida's current law on use of force and deadly force is similar to what it was when *Miller* was issued in 1993. *See* S.B. 438, 1997 Fla. Sess. Law Serv. Ch. 97-102, amending Fla. Stat. Ann. 776.012. Under the pre-1997 version of that statute, "[a] person is justified in the use of force, except deadly force, against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. However, he is justified in the use of deadly force only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another or to prevent the imminent commission of a forcible felony." *Id.* In contrast, R.C. 2901.05 does not rely on distinctions between deadly and non-deadly force.

{¶ 70} In Florida, " '[i]f the type of force used is clearly deadly or non-deadly as a matter of law, only the applicable instruction should be given.' " *Larsen v. State*, 82 So.3d 971, 974 (Fla.App.2011), citing *Cruz v. State*, 971 So.2d 178, 182 (Fla.App.2007). " 'Where the evidence at trial does not establish that the force used by the defendant was deadly or non-deadly as a matter of law, the question is a factual one to be decided by the jury, and the defendant is entitled to jury instructions on the justifiable use of both types of force.' " *Id.*, quoting *Cruz.* For the reasons stated, *Miller* is not persuasive.

{¶ 71} If we were inclined to rely on out-of-state authority, we could use *State v. Cook*, 254 N.C.App. 150, 802 S.E.2d 575 (2017), *affirmed per curiam*, 370 N.C. 506, 809 S.E.2d 566 (2018).

{¶ 72} In *Cook*, the defendant was convicted on two counts of "felonious assault with a firearm on a law enforcement officer." *Id.* at 151. When police were attempting

to serve a warrant, the defendant shot at his bedroom door. He claimed he was asleep, had not heard the police, thought intruders had entered the house, and " 'had no specific intention' and 'was just scared' " when he fired his weapon. *Id.* at 151-152.

**{¶ 73}** The court of appeals rejected the defendant's claim that a self-defense instruction should have been given. In this regard, the court stated that:

> Because Defendant essentially testified that he did not intend to shoot anyone when he fired his gun, we are compelled by Supreme Court precedent to conclude that he was not entitled to a self-defense instruction, notwithstanding the fact that there may have been other evidence from which the jury could infer that Defendant did intend to shoot the officer, *e.g.*, that he fired the shots towards the bedroom door. Accordingly, we find no error.

*Cook*, 254 N.C.App. at 152, 802 S.E.2d 575.

**{¶ 74}** Relying on cases outside Ohio is unnecessary, however, as ample authority exists in Ohio, including *Grant* and the other cases discussed, to reject Wilson's claim that a self-defense instruction should have been given and/or that trial counsel was ineffective in failing to ask for one.

**{¶ 75}** As a final matter, the dissent also believes that trial counsel had no true strategy and was deficient in failing to object more often, especially to questions and argument about Wilson's pre-arrest and post-arrest silence, to introduction of evidence about Wilson's juvenile record, and in failing to ask for an instruction on aggravated menacing as a lesser included offense. Wilson did not raise any of these points on

appeal, however, and we cannot construct arguments for the parties.

{¶ 76} For the reasons stated, self-defense does not apply to the facts of this case, and trial counsel did not provide ineffective assistance of counsel by failing to request a self-defense instruction. Accordingly, Wilson's assignment of error is overruled.

### III. Conclusion

{¶ 77} Wilson's sole assignment of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

LEWIS, J., concurs.

DONOVAN, J., dissents:

{¶ 78} The majority's decision encourages an individual to only shoot to kill or maim when confronted by an armed assailant. This cannot be the law. The law necessarily places a value on human life. As this court noted in *State v. Blair,* 2d Dist. Montgomery No. 28904, 2021-Ohio-3370: " 'To warrant an instruction on self-defense, R.C. 2901.05(B)(1) mandates there must be evidence that supports that the defendant used force to defend himself or herself.' " *Id.* at ¶ 11, citing *State v. James, 2d Dist.* Montgomery No. 28892, 2021-Ohio-112, ¶ 20. "To support a claim of self-defense, a defendant must demonstrate that he acted out of fear or he felt that his life was threatened." *State v. Crawford,* 2d Dist. Montgomery No. 22314, 2008-Ohio-4008, ¶ 26. The deadly force exerted need not be upon an aggressor, but merely *against* an aggressor. *Black's Law Dictionary,* 6th Edition, defines *against* as "adverse to, contrary;

without the consent of; in conflict with." Wilson admitted he intentionally and knowingly had discharged a firearm capable of causing death or great bodily harm against and in proximity to Reffett. His purpose was to repel a perceived attack upon him. He was entitled to a self-defense instruction. Wilson need only have had "reasonable grounds to believe and an honest belief that such force as was used was necessary to protect himself." *State v. Kucharski,* 2d Dist. Montgomery No. 20815, 2005-Ohio-6541, ¶ 18.

{¶ 79} The applicability of self-defense must be determined on the particular facts of each case, not the charges the State elects to bring and must prove. Wilson adduced evidence that *tended to support* that he had both an objective and subjective belief that force was necessary. "The use of a gun constitutes the use of deadly force." *State v. Dale,* 2d. Dist. Montgomery No. 2012-CA-20, 2013-Ohio-2229, ¶ 15. Self-defense "presumes intentional, willful use of force to repel force or escape force." *State v. Champion,* 109 Ohio St. 281, 286-287, 142 N.E. 141 (1927).

{¶ 80} Although the *Hubbard* case cited by the majority suggests that when an individual asserts that he did not intend to cause harm, it precludes a claim of self-defense, *Hubbard* rests upon faulty reasoning. *Hubbard*, 10th Dist. Franklin No. 11AP-945, 2013-Ohio-2735. *Hubbard* cited *State v. Johnson,* 10th Dist. Franklin No. 06 AP-878, 2007-Ohio-2792, which was an accidental discharge case wherein the defendant denied any intentional use of deadly force. Hence it is of no value to our analysis. Any claim that a gun accidentally discharged is indeed contrary to a claim of self-defense. Likewise, the *Poole, Barnd,* and *Travis* cases cited by the majority involved accident defenses. Thus, in my view, they are not persuasive binding authority in deciding

Wilson's case.

{¶ 81} By raising a defense of accident, a defendant denies any intent. To the contrary, Wilson admitted that the action he took, discharging a firearm (the actus rea) taken to defend himself, was a purposeful, deliberate, knowing, and intelligent act. Wilson testified, "All I wanted to do was make noise to get him out of my face. That man had a gun to me. * * * I got one shot out of the vehicle, and it did its job for real. He got away from me." This claim of self-defense, a shot fired in defense of Wilson himself and his female companion, *tended to support* that he was not criminally liable for employing deadly force. Wilson asserted he was put under the necessity or apparent necessity of doing so without fault or violence on his part. He argued that he did so in order to protect himself from the peril of death or serious bodily harm at the hands of a man who, by Wilson's account, pulled a gun and threatened to "ghost him." Succinctly put, Wilson claimed a justifiable shooting. He claimed he was reacting to the aggressive conduct of Reffett.

{¶ 82} In my view, the majority's analysis not only places upon Wilson a burden to prove his self-defense claim but also relieves the State of its burden to establish all the elements of felonious assault beyond a reasonable doubt. Self-defense is not a crime, and it is not unlawful; rather it is an act of justification. The defense of self-defense asserted herein involved the question of whether the shot fired by Wilson was a crime ab initio. Did Wilson employ justifiable defensive force against Reffett? His testimony *tended to support* that he did. Hence, he was entitled to the instruction. It can't be "some element" of self-defense as suggested initially by the trial court and later by the

defendant's attorney himself. I do not agree with the majority that a criminal defendant is required to "admit" anything in the sense of acknowledging that any particular facts are true in order to assert self-defense. To the extent that a defendant in raising self-defense accepts for the sake of the argument that he committed the *act* alleged in a charge, the defendant may do so only for the limited purpose of raising self-defense. If the jury reasonably believed that Wilson's single shot, characterized as a "warning shot" (not by Wilson), was reasonably necessary to protect him and his girlfriend, such conduct would have been privileged and could not result in criminal liability.

{¶ 83} Wilson admitted that the shot fired was intentional. Self-defense reasonably requires that he admit the shooting was intentional and not accidental. In other words, it was done to protect oneself or another. Notably, Wilson did not assert that he fired into the ground.

{¶ 84} Where no construction of the evidence would support a finding that Wilson shot in self-defense, the trial court properly may refuse to charge on self-defense; however, this clearly was not the scenario as it existed on this record. However the shot was characterized, Wilson's justification/defense for his action was self-defense, and the jury should have been so instructed. This case was essentially "one on one," Reffett's version versus Wilson's account. On this record, defense counsel's performance unquestionably prejudiced Wilson. Furthermore, the Ohio Supreme Court and this court have never held that a shot deemed a "warning shot" (after the fact) cannot constitute self-defense. Unquestionably, according to Wilson's account, his motive was of a defensive nature.

**{¶ 85}** The majority suggests that the failure to request a self-defense instruction was just trial strategy. But a careful reading of the record reveals that trial counsel had no true trial strategy. In fact, defense counsel made not one objection during the entirety of an attempted murder/felonious assault trial. Further, counsel ignored questions and closing argument about Wilson's pre-arrest and post-arrest silence.[1] Furthermore, counsel's deficient performance is illuminated by the fact that he introduced Wilson's juvenile record![2]

---

[1] For example, on cross-examination, the following exchange occurred regarding Wilson's encounter with law enforcement in West Jefferson after he ran out of gas:

> Q. When you got to where the vehicle was stopped in West Jefferson, there's three deputies and two officers there around you, correct?
> A. * * * There was a lot of cops there.
> * * *
> Q. You never told them about having a gun pulled on you, did you?
> * * *
> A. No.
> Q. And it was less than an hour, right?
> A. Yeah. * * *
> Q. You never told them you were chased all the way there, correct?
> A. No. I didn't tell them anything about that. I'm a convicted felon. I shouldn't have touched the gun at all. * * *
> Q. At no point after this chase, no point after that you reach out to Springfield Police Department Detective Jordan, I need to talk to you man. I need to tell you what happened. Did you ever do that?
> A. I don't know him.
> * * *
> Q. You had nearly four weeks to reach out to the Springfield Police Department.
> A. I had no time. I had a warrant out on my head two days later before I could even get to a phone, got on Facebook. * * *

Further, in closing argument, the prosecutor argued that Wilson "didn't mention a word about what happened. Nothing. Didn't call the police either. Didn't call Detective Jordan or anyone even after he told you on the stand that they knew he had a warrant." The prosecutor also used this argument in rebuttal.

[2] The following exchange occurred during direct examination:

**{¶ 86}** If the defense attorney's real trial strategy in Wilson's defense was that he "only wanted to frighten," then an instruction for aggravated menacing should have been requested. It was not. In deciding whether to provide a lesser-included or inferior offense instruction, a trial court must find sufficient evidence to allow a jury to reasonably reject the greater offense and to find a defendant guilty on a lesser-included or inferior-degree offense. *State v. Ferrell,* 2020-Ohio-6879, 165 N.E.3d 743, ¶ 34-35 (10th Dist.). When the evidence pertaining to a lesser-included or inferior-degree offense meets the test, a trial court must instruct the jury on the lesser-included or inferior-degree offense. *State v. Conley,* 2015-Ohio-2553, 43 N.E.3d 775, ¶ 32 (2d Dist.). At a minimum, Wilson's account met this test and an aggravated menacing instruction should have been requested.

**{¶ 87}** If indeed a self-defense instruction was not warranted, although I strongly disagree with this conclusion by the majority, additional instructions on justification or an inferior offense should have been given. It is illogical to allow defense counsel to argue "some element" of self-defense but not instruct on self-defense.

**{¶ 88}** I would reverse and remand for a new trial.

---

Q. Anything as a minor?
* * *
Q. When you were a minor, did you have - -
A. * * * I was a bad little kid.
Q. Well, what convictions?
A. A couple thefts, obstruction of justice. I think a burglary. Little stuff, drugs, marijuana.

Copies sent to:

Ian A. Richardson
Carly Edelstein
Hon. Douglas M. Rastatter