[Cite as *State v. Patterson*, 2016-Ohio-2750.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**GREENE COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | C.A. CASE NO. 2015-CA-57 |
| | : | |
| v. | : | T.C. NO. 14CR683 |
| | : | |
| IVAN A. PATTERSON | : | (Criminal appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . .

**O P I N I O N**

Rendered on the ___29th___ day of _____April_____, 2016.

. . . . . . . . . .

STEPHANIE R. HAYDEN, Atty, Reg. No. 0082881, Assistant Prosecutor, 61 Greene Street, Xenia, Ohio 45385
        Attorney for Plaintiff-Appellee

CHRISTOPHER C. GREEN, Atty. Reg. No. 0077072, 400 Wayne Avenue, Dayton, Ohio 45410
        Attorney for Defendant-Appellant

. . . . . . . . . . . .

DONOVAN, P.J.

{¶ 1} Defendant-appellant Ivan A. Patterson appeals his conviction and sentence for one count of assault, in violation of R.C. 2903.13(A), a misdemeanor of the first degree; one count of abduction, in violation of R.C. 2925.02(A)(2), a felony of the third

degree; and one count of violating a protection order[1], in violation of R.C. 2919.27(A)(1), a misdemeanor of the first degree. Patterson filed a timely notice of appeal with this Court on September 23, 2015.

{¶ 2} The incident which forms the basis for the instant appeal occurred during the evening of August 22, 2014, when Patterson physically attacked his live-in girlfriend, Jasmine Williams, in an apartment that they shared in Beavercreek, Ohio. At approximately 7:00 p.m. that night, Patterson was cooking in the kitchen of the apartment that he and Williams shared. Williams asked Patterson to turn on the stove vent because of the smoke being generated from his cooking. Thereafter, the two began to argue, and Patterson left the apartment for a period of approximately one and a half to two hours. Upon his return to the apartment, Patterson located Williams in the bedroom lying in bed. Patterson began taking his clothes out of the closet and throwing them on the bed. When Williams asked him what he was doing, Patterson stated that he was moving out because he believed that she was being unfaithful. Williams testified that she tried talking to Patterson, but he began choking her, stating, "b****, shut up before I kill you."

{¶ 3} When Patterson eventually loosened his grip on her neck, Williams began crying and asked him why he was choking her. Williams testified that Patterson immediately started choking her again, stating, "didn't I tell you to shut up before I kill you?" After a short time, Williams was able to tell Patterson that she wanted some water. Patterson let her go, and Williams left the bedroom and attempted to run out of the

---

[1] Williams petitioned for and was granted a protection order against Patterson on July 14, 2014, after an incident in Cincinnati, Ohio, during which Williams alleged that Patterson pushed her out of her own car and drove away, stranding her in a parking lot. We note that Williams acknowledges that she bonded Patterson out of jail immediately after this incident and that the two continued to live together after the protection order was granted.

apartment. Williams testified that Patterson caught her before she could leave, dragged her back into the apartment by her hair, and threw her into a wall. Williams testified that she was eventually able to leave the apartment, but Patterson grabbed her in the hallway and bit her on the mouth. Patterson then threw her into the wall again. After Williams fell down, Patterson kicked her in the stomach and the shin. At that point, Patterson ran back into the apartment, got his keys, and left. Williams testified that she went back into her apartment and called 911. While she was on the phone with the 911 operator, she stated that she was holding a gun that she kept in her nightstand.

{¶ 4} Shortly thereafter, Officer Matt Stull of the Beavercreek Police Department responded to Williams' 911 call. Officer Stull testified that upon his arrival, he observed that Williams appeared to have lacerations to her face, mouth, and arms. Officer Stull described Williams as "hysterical" and noted that she was having difficulty breathing. Officer Stull further testified that Williams "was embarrassed and scared for her life." Officer Stull testified that he observed that Williams had blood dripping from her face, bruises on her arms, and her leg was swollen. Officer Stull observed blood on the door leading into Williams' apartment, as well as blood spatter in the hallway.

{¶ 5} Dr. Debra Edwards was the physician who treated Williams on the night she was attacked by Patterson. Dr. Edwards testified that she observed a laceration above the left side of Williams' upper lip, tenderness around her right eye, tenderness around her left jaw, swelling and tenderness to the anterior portion of her neck, tenderness to her right shin, and tenderness around her left shoulder. Dr. Edwards testified that Williams' neck injuries were consistent with having been choked.

{¶ 6} Patterson testified on his own behalf at trial. Similar to Williams' testimony,

Patterson testified that they argued after she asked to him to turn on the stove vent, and he left the apartment for approximately ninety minutes. Patterson testified that he returned to the apartment and began to pack his clothes so that he could leave. When Williams attempted to talk to him, Patterson testified that he shoved her away only after she grabbed him. Patterson testified that Williams punched him, and he then pushed her into a wall in the bedroom. Patterson testified that he tried to pick up his clothes in order to leave, but Williams went to her nightstand and retrieved her handgun.

{¶ 7} Patterson testified that he was able to disarm Williams by jerking her hand so that she dropped the gun. Patterson testified that Williams tried to pick up the gun, and during the ensuing struggle to keep her from getting the gun, he bit her just above her mouth. At that point, Patterson testified that they agreed to stop fighting, and Williams left the bedroom. Patterson picked up his clothes and tried to leave the apartment. Patterson testified that Williams got angry because he was trying to leave with items that she had purchased for him, and she began scratching him and swinging her fists at him. Patterson testified that he slapped her off of him and left the apartment.

{¶ 8} Patterson was subsequently indicted on December 12, 2014, for one count of attempted felonious assault, one count of abduction, and one count of violating a protection order. At his arraignment on December 19, 2014, Patterson stood silent, and the trial court entered a plea of not guilty on his behalf.

{¶ 9} After a two-day jury trial ending on July 14, 2015, Patterson was found guilty of one count of assault (as a lesser included offense of attempted felonious assault as charged in the original indictment), one count of abduction, and one count of violating a protection order. On September 10, 2015, the trial court sentenced Patterson to 180

days in jail for assault, thirty-six months in prison for abduction, and 180 days in jail for violating the protection order. The trial court ordered that the sentences be served concurrently for an aggregate sentence of thirty-six months in prison.

{¶ 10} It is from this judgment that Patterson now appeals.

{¶ 11} Patterson's sole assignment of error is as follows:

{¶ 12} "THE APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL WHEN THE TRIAL COUNSEL FAILED TO REQUEST A JURY INSTRUCTION FOR THE AFFIRMATIVE DEFENSE OF SELF-DEFENSE AND BY FAILING TO HAVE THE JURY INSTRUCTED ON THAT ISSUE."

{¶ 13} In his sole assignment, Patterson contends that he was denied effective assistance when his counsel failed to request a jury instruction on self-defense.

{¶ 14} "We review the alleged instances of ineffective assistance of trial counsel under the two prong analysis set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and adopted by the Supreme Court of Ohio in *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373. Pursuant to those cases, trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. *Strickland,* 466 U.S. at 688. To reverse a conviction based on ineffective assistance of counsel, it must be demonstrated that trial counsel's conduct fell below an objective standard of reasonableness and that his errors were serious enough to create a reasonable probability that, but for the errors, the result of the trial would have been different. *Id.* Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective

assistance of counsel." (Internal citation omitted). *State v. Mitchell,* 2d Dist. Montgomery No. 21957, 2008-Ohio-493, ¶ 31.

**{¶ 15}** An appellant is not deprived of effective assistance of counsel when counsel chooses, for strategic reasons, not to pursue every possible trial tactic. *State v. Brown,* 38 Ohio St.3d 305, 319, 528 N.E.2d 523 (1988). The test for a claim of ineffective assistance of counsel is not whether counsel pursued every possible defense; the test is whether the defense chosen was objectively reasonable. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). A reviewing court may not second-guess decisions of counsel which can be considered matters of trial strategy. *State v. Smith,* 17 Ohio St.3d 98, 477 N.E.2d 1128 (1985). Debatable strategic and tactical decisions may not form the basis of a claim for ineffective assistance of counsel, even if, in hindsight, it looks as if a better strategy had been available. *State v. Cook,* 65 Ohio St.3d 516, 524, 605 N.E.2d 70 (1992).

**{¶ 16}** In this case, Patterson argues that his counsel denied him effective assistance of counsel by failing to request a self-defense jury instruction. "Generally, the failure to request jury instructions is purely a matter of trial tactics and will not be disturbed upon review." *State v. Clayton,* 62 Ohio St.2d 45, 47–49, 402 N.E.2d 1189 (1980). "A court's jury instructions must be based on the actual issues in the case as presented by the evidence. * * * Thus, a court should not give an instruction unless it is specifically applicable to the facts in the case." *State v. Fritz,* 163 Ohio App.3d 276, 2005-Ohio-4736, 837 N.E.2d 823, ¶ 19 (2d Dist.), citing *State v. Guster,* 66 Ohio St.2d 266, 421 N.E.2d 157 (1981).

**{¶ 17}** With respect to self-defense, Ohio law provides:

Physical force may be used in self-defense, subject to two qualifications. First, the defendant cannot have been at fault in creating the situation that gave rise to the danger against which he used force to protect himself. Second, the defendant must have had reasonable grounds to believe, and an honest belief, that such force as was used was necessary to protect himself. That second justification differs in its application depending on the nature of the force used, whether it was deadly or non-deadly.

*State v. Kucharski,* 2d Dist. Montgomery No. 20815, 2005–Ohio–6541, ¶ 18.

**{¶ 18}** "To determine whether an instruction on self-defense is warranted, the trial court must determine 'whether the defendant has introduced sufficient evidence, which, if believed, would raise a question in the minds of reasonable men concerning the existence of such issue.' " *Fritz,* 163 Ohio App.3d 276, 2005-Ohio-4736, 837 N.E.2d 823, at ¶ 19, quoting *State v. Melchior,* 56 Ohio St.2d 15, 381 N.E.2d 195 (1978).

**{¶ 19}** To prove that Patterson committed attempted felonious assault, the State was required to establish that Patterson "knowingly *** attempt[ed] to cause serious physical harm to [Williams]." R.C. 2903.11(A). "The term 'knowingly' means when a person 'is aware that his conduct will probably cause a certain result or will probably be of a certain nature.' " R.C. 2901.22(B). Upon the request of Patterson's counsel, the trial court instructed the jury on the lesser included offense of assault which merely required the State to prove that Patterson knowingly caused or attempted to cause physical harm to Williams.

**{¶ 20}** In order to support a claim for self-defense, a defendant must demonstrate that he acted out of fear or he felt that his life was threatened. *State v. Crawford,* 2d Dist.

Montgomery No. 22314, 2008-Ohio-4008, ¶ 26.   Patterson provided the following pertinent testimony during trial:

Defense Counsel: Okay so when you get back to the apartment what do you do?   How do you get in?

Patterson: I walk in with my key.

Q: Okay.   Where was [Williams]?

A: She was laying in the bed messing with her IPad.

Q: Okay.   Now I don't want to know what she said.   I want to know what she did.   Did she do anything when you came in the room?

A: When I first came, no, she didn't do anything.

Q: Okay.   Did you do anything to her?

A: No, I didn't.

Q: Okay and what did you proceed to do?

A: I went into the closet and started getting my clothes out and folding them so I could pack them.

Q: And why were you packing clothes?

A: Because I had made up my mind that I was going to go ahead leave [sic] and go back home because it wasn't working out here.

Q: Okay.   And then you heard [Williams] testify yesterday that she said what are you doing?   Is that correct?

A: She said what you doing leaving, yeah.

Q: *Okay.   What did she do after you said you were leaving?*

A: *She jumped up out of bed and ran around to where I was and grabbed*

*me.   She tried to stop me from doing what I was doing to tell me let's talk about it.*

Q: *Okay. And then what did you do?*

A: *I told her that I didn't want to talk and I pushed-shoved-away from her.   I told her I didn't talk [sic] I've already spoken with who I need to speak to, which was my momma.   And when I said that she became angry and hit me.*

\*\*\*

Q: *What did you do after she hit you?*

A: *Well when she hit me I kind of – she was standing real close to me so when she swung at me she kind of hit me and then she tried to swing at me again and I pushed her away from me.*

Q: Okay and pushed her where?

A: I think she might have hit the wall.

Q: Okay.

A: Because we was right by the wall.

Q: And then what did you proceed to do after you pushed her away from you?

A: Well when I pushed her, I had dropped some stuff on the floor so I go to reach down to grab some clothes that I dropped.

Q: *Okay.   And then did you observe anything at that point?*

A: *Yeah, I saw her run over to the dresser.*

Q: *And what was she doing running over to the dresser?   Do you know?*

A: *Yeah, I realized she was going to get her gun because she kept her gun in the dresser drawer.*

*\*\*\**

Q: *Okay; so after you see her going over to grab a gun, what do you do?*

A: *I panic and I run up behind her because when I got to her she got to the drawer and opened it up and was coming out with the gun. Because the bedroom was small, so it didn't take me long to get over to where she was. And I grabbed her hand with the gun, and I don't know if I grabbed her by the back of her shirt, but I took her hand and I jerked it like that and she dropped the gun. The gun fell on the floor and she started turning around trying to reach – we got into a struggle. She, she – we got into a physical altercation.*

Q: *So were you scared?*

A: *Yeah, I was scared.*

Q: *Why were you scared?*

A: *Because [Williams] had already showed signs of being mentally unstable and I feel like if she had got that gun, she wouldn't have been playing with it. She would have shot me.*

**{¶ 21}** If Patterson's testimony is to be believed, then he was acting in his own self-defense from the moment that the confrontation with Williams began. In fact, Patterson's testimony that he believed that Williams was going to shoot him with the handgun she kept in her nightstand demonstrates that he acted out of fear, and he felt that his life was threatened. It is undisputed that Williams kept a handgun in her nightstand because she

told the 911 operator that she was holding the gun when she called to report the alleged assault perpetrated by Patterson. Under Patterson's version of events, Williams was the aggressor and her actions caused him to believe that he was in imminent danger of bodily harm. Patterson specifically testified that he grabbed Williams' hand and "jerked" it so that she would drop the gun. Patterson further testified that the ensuing struggle with Williams occurred because he was trying to keep her from regaining control of the handgun. Based on his testimony, the jury could have reasonably concluded that Patterson purposefully used force to protect himself from Williams.

{¶ 22} We also note that in defense counsel's opening statement, he portrayed Williams as a controlling and manipulative person who was used to getting her way. Defense counsel further stated that when Patterson attempted to end the relationship on the day of the alleged assault, Williams became angry and violent. While defense counsel did not explicitly state that the evidence would establish that Patterson was acting in self-defense when he fought with Williams, it was a viable defense for the jury to consider. Moreover, in his closing statement, defense counsel stated that Williams "pulled a gun on Mr. Patterson in order for him not to leave." Once again, the jury could reasonably conclude that Patterson purposefully used force to protect himself from Williams. Nevertheless, defense counsel never requested the trial court to instruct the jury on self-defense. We also note that during deliberations, the jury sent a question to the trial court in which it specifically asked if it was permitted to consider whether Patterson acted in self-defense when he attacked Williams. The trial court responded to the jury in the negative. We find that Patterson's counsel should have requested an instruction on self-defense, and his failure to do so fell below an objective standard of

reasonableness.

**{¶ 23}** Upon review, we further conclude that there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland,* 466 U.S at 694, 104 S.Ct. 2052, 80 L.Ed.2d 674; *Bradley,* 42 Ohio St.3d at 142, 538 N.E.2d 373. In our judgment, there is a reasonable probability that the jury, if given an instruction on self-defense, might have concluded that Patterson had acted in self-defense when he grabbed Williams' hand and "jerked" it so that she would drop the gun. Patterson further testified that the ensuing struggle with Williams occurred because he was trying to keep her from regaining control of the handgun. Accordingly, we conclude that Patterson was prejudiced by his trial counsel's conduct.

**{¶ 24}** Patterson's sole assignment of error is sustained.

**{¶ 25}** Patterson's sole assignment of error having been sustained, the judgment of the trial court is reversed, and this matter is remanded for further proceedings consistent with this opinion.

. . . . . . . . . .

FROELICH, J. and HALL, J., concur.

Copies mailed to:

Stephanie R. Hayden
Christopher C. Green
Hon. Michael A. Buckwalter