[Cite as *State v. Kennedy*, 2026-Ohio-2203.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | C.A. No. 30470 |
| Appellee | : | |
| | : | Trial Court Case No. 2024 CR 01950 |
| v. | : | |
| | : | (Criminal Appeal from Common Pleas |
| EXCO KENNEDY | : | Court) |
| | : | |
| Appellant | : | **FINAL JUDGMENT ENTRY &** |
| | : | **OPINION** |

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on June 12, 2026, the judgment of the trial court is affirmed.

Costs to be paid as stated in App.R. 24.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately serve notice of this judgment upon all parties and make a note in the docket of the service. Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note the service on the appellate docket.

For the court,

_____
RONALD C. LEWIS, PRESIDING JUDGE

TUCKER, J., and HANSEMAN, J., concur.

JOHNNA M. SHIA, Attorney for Appellant

ANDREW T. FRENCH, Attorney for Appellee

LEWIS, P.J.

**{¶ 1}** Defendant-appellant Exco Kennedy appeals from his murder and aggravated possession of drugs convictions in the Montgomery County Common Pleas Court following a jury trial. For the following reasons, the trial court's judgment is affirmed.

## I.    Facts and Course of Proceedings

**{¶ 2}** On July 7, 2024, Kennedy stabbed R.M. with a knife, which resulted in R.M.'s death. Shortly thereafter, Kennedy was indicted by a Montgomery County grand jury on two counts of murder (proximate result) in violation of R.C. 2903.02(B), unclassified felonies; one count of felonious assault (serious physical harm) in violation of R.C. 2903.11(A)(1), a second-degree felony; one count of felonious assault (deadly weapon) in violation of R.C. 2903.11(A)(2), a second-degree felony; and one count of tampering with evidence in violation of R.C. 2921.12(A)(2), a third-degree felony ("A Indictment").

**{¶ 3}** On October 25, 2024, Kennedy was indicted by a Montgomery County grand jury on one count of aggravated possession of drugs (Schedule I or II) in violation of R.C. 2925.11(A), a fifth-degree felony ("B Indictment"). The basis for the B Indictment was methamphetamine found in Kennedy's sock when he was arrested after stabbing R.M. Kennedy entered not guilty pleas to all the counts in the two indictments.

**{¶ 4}** Prior to trial, Kennedy filed a Crim.R. 12.2 notice indicating his intent to argue self-defense. Kennedy also filed several motions in limine, including one in which he asked the court to allow him to plead guilty to the B Indictment, withhold sentencing until after the

conclusion of the trial on the A Indictment, and preclude any mention of the drugs during the trial of the A Indictment. Following a hearing, the trial court denied the motion in limine to the extent it sought to exclude any evidence of the drugs during trial. The trial court found that the evidence was relevant and that the probative value of this evidence was not substantially outweighed by the danger of unfair prejudice.

{¶ 5} Kennedy entered a guilty plea to the B indictment, and the case proceeded to trial on the A Indictment. The following summary of facts are adduced from the trial testimony and exhibits.

{¶ 6} Kennedy lived next door to Stanley, who was dating R.M. Kennedy and Stanley were friendly, and he mowed her grass. Stanley gave Kennedy food from the food pantry and allowed him to use her shower and washing machine and dryer.

{¶ 7} On Sunday, July 7, 2024, Kennedy used Stanley's washing machine and dryer. Just after 8:00 p.m., Kennedy returned home from Stanley's house with his laundry basket. As Kennedy went through his laundry, he discovered that he was missing a piece of the interior lining for his motorcycle helmet that he had put in the washing machine. Just before 9:00 p.m., Kennedy returned to Stanley's home to ask about the missing helmet piece. R.M. answered the door and told Kennedy that Stanley was in the shower. Stanley said she would be right out and Kennedy returned home.

{¶ 8} About 10 minutes before 10:00 p.m., Kennedy returned to Stanley's house. Stanley then followed Kennedy back to his porch. Kennedy demonstrated what the missing helmet piece looked like, but Stanley denied having seen the item in her house. During this interaction, Kennedy used coarse language and became increasingly agitated. Stanley agreed to search again for the missing helmet piece in her house. Stanley returned home and Kennedy followed her to her house. R.M. was inside the home at that time but was not

3

involved in the situation. Kennedy continued to yell at Stanley about the missing helmet piece and scream profanities.

{¶ 9} At 9:55 p.m., Kennedy returned home, where he changed his clothes, put on motorcycle gloves, and attached a sheathed Amazon survival knife with a nine-inch blade to his belt on his back left side. Kennedy testified he intended to ride his motorcycle to the hospital to visit a friend. He stated that he always wore his knife as a deterrent when he rode his motorcycle because "nobody's going to attack a tall black dude with a knife on his belt." Trial Tr. 897.

{¶ 10} At 9:58 p.m., Kennedy walked back toward Stanley's house where he began pacing on the sidewalk in front of her home. While pacing and arguing with Stanley, Kennedy was hitting his fists together and stretching his arms. Kennedy also yelled for R.M. to "bring his punk ass outside so we can settle it." Trial Tr. at 981. Kennedy continued pacing on the sidewalk between Stanley's house and his house until 10:03 p.m., at which time R.M. came outside wearing only boxer shorts.

{¶ 11} When R.M. walked outside, Kennedy asked, "what's going on [R.M.]?" R.M. walked to the sidewalk along the street where Kennedy was walking and responded, "What's the problem?" Kennedy asked if R.M. wanted to fight. A verbal argument ensued between R.M. and Kennedy while on the sidewalk, during which R.M. encouraged Kennedy to hit him. Instead of hitting R.M., Kennedy unsheathed his survival knife and stabbed R.M. in the abdomen. R.M. was outside for less than 30 seconds before he was stabbed.

{¶ 12} R.M. bent over and grabbed at his internal organs, which were spilling out. Kennedy pushed R.M. to the ground, stood over him, and punched R.M. in the back of the head and neck eight times. A neighbor across the street, Brooks Cook, witnessed the assault and called 911 at 10:05 p.m. Kennedy handed Cook his survival knife, which Cook

4

took across the street and threw behind a fence to get it away for safety. Later after the police responded, Cook informed the police of the survival knife, which was collected.

{¶ 13} After the stabbing, Kennedy walked around the street yelling and cursing and returned to R.M., who was lying on the ground covered in blood. At 10:06 p.m., while Kennedy was kneeling next to R.M., Kennedy threw a bloody pocketknife into the street. The pocketknife, which was fully open and completely covered in blood, was ultimately collected by police.

{¶ 14} When police arrived, R.M. was laying in the street with his intestines and organs exposed outside his abdomen. Kennedy, who was on the ground with R.M. and covered in blood, admitted that he stabbed R.M. The police immediately took Kennedy into custody. Because Kennedy appeared to be in an altered state, the officers were told to take him to the hospital to be examined before he could be admitted to the jail. At the hospital, medical personnel removed a bag of methamphetamine from one of Kennedy's socks. Kennedy was not admitted to the hospital and was taken to jail. Kennedy did not have any physical injuries.

{¶ 15} Despite significant medical intervention, including surgeries, medication, such as fentanyl, and massive blood transfusions, R.M. died the following morning. R.M.'s urine screen test at the hospital was presumptive positive for methamphetamines and marijuana. R.M.'s post-mortem blood sample from the coroner's office tested positive for gabapentin, methamphetamine, amphetamine (a metabolite of methamphetamine), a cocaine metabolite, and trace amounts of fentanyl and marijuana metabolites. R.M.'s cause of death was sharp force trauma of the abdomen.

{¶ 16} Surveillance video from Kennedy's home was recovered and presented to the jury. The video evidence depicted the events leading up to the stabbing, the stabbing itself,

5

and the events immediately after. Portions of body worn camera video of responding police officers were also introduced into evidence at trial along with the two knives collected from the scene.

{¶ 17} Kennedy testified on his own behalf. Kennedy admitted stabbing R.M. but claimed he did it because he was afraid R.M. was going to stab him. Kennedy testified he knew of R.M.'s history of domestic violence, he believed R.M. was on methamphetamine at the time of the incident, and he knew R.M. to carry a weapon. Although Kennedy admitted that he did not see R.M. with a knife in his hand, Kennedy testified that R.M. had a pocketknife and he took it away from R.M. while R.M. was on the ground bleeding. Kennedy stated that he had previously given the pocketknife to Stanley, which was how Kennedy believed R.M. had obtained it.

{¶ 18} At the time of trial, Kennedy was 46 years old, had worked in landscaping and security, and received Social Security Disability benefits for mental health problems. He admitted he took drugs the day of the stabbing but denied he was under the influence when he stabbed R.M. Kennedy claimed that the methamphetamine found in his sock was for someone else and that he had not used methamphetamine that day. Kennedy acknowledged that he wrote some "disturbing" jail messages in which he claimed to have killed R.M. over a missing helmet piece but explained that he wrote the jail messages when he was in a bad place physically and mentally.

{¶ 19} The jury found Kennedy guilty of two counts of murder and two counts of felonious assault but not guilty of tampering with evidence. The trial court merged each of the felonious assault and murder charges into one count of murder, and the State elected sentencing on murder predicated on felonious assault with a deadly weapon. The trial court imposed a mandatory term of 15 years to life in prison for murder (A Indictment) and

6

12 months in prison for aggravated possession of drugs (B Indictment) and ordered the sentences to run concurrently. The trial court ordered Kennedy to pay court costs and advised him that he must register for the violent offender database. Kennedy timely appealed.

## II. The jury's rejection of Kennedy's self-defense claim was not against the weight of the evidence

{¶ 20} Kennedy's first assignment of error states:

The manifest weight of the evidence supported Kennedy's self-defense claim.

{¶ 21} In Ohio, a person is allowed to act in self-defense. R.C. 2901.05(B)(1). "If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense . . . , the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense . . . ." *Id*.

{¶ 22} The foregoing statute "places the initial burden of producing evidence 'that tends to support' a self-defense claim on the defendant." *State v. Bowen*, 2024-Ohio-1079, ¶ 11 (2d Dist.), quoting R.C. 2901.05(B)(1). "[I]f the defendant's evidence and any reasonable inferences about that evidence would allow a rational trier of fact to find all the elements of a self-defense claim when viewed in the light most favorable to the defendant, then the defendant has satisfied the burden." *State v. Messenger*, 2022-Ohio-4562, ¶ 25.

{¶ 23} Once the defendant puts forth sufficient evidence that he or she was acting in self-defense, the burden then shifts to the State to prove that the defendant did not act in self-defense. *Bowen* at ¶ 12, citing *Messenger* at ¶ 19. To accomplish this, the State need only disprove one of the elements of a self-defense claim beyond a reasonable doubt. *State v. Knuff*, 2024-Ohio-902, ¶ 191.

7

**{¶ 24}** The elements of a self-defense claim when deadly force is used are: "(1) that the defendant was not at fault in creating the situation giving rise to the affray; (2) that the defendant had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) that the defendant did not violate any duty to retreat or avoid the danger." *State v. Barnes*, 2002-Ohio-68, ¶ 11, citing *State v. Robbins*, 58 Ohio St.2d 74 (1979), paragraph two of the syllabus. Notably, a person no longer has a duty to retreat before using force in self-defense if that person is in a place in which the person lawfully has a right to be. R.C. 2901.09(B).

**{¶ 25}** The State's burden of disproving the defendant's self-defense claim beyond a reasonable doubt is subject to a manifest-weight review on appeal. *Messenger*, 2022-Ohio-4562, at ¶ 27; *Knuff* at ¶ 208. "A reviewing court considering a manifest-weight claim 'review[s] the entire record, weighs the evidence and all reasonable inferences, [and] considers the credibility of witnesses.'" (Bracketed text in original.) *State v. Group*, 2002-Ohio-7247, ¶ 77, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). "The question for the reviewing court is 'whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Id*., quoting *Martin* at 175. Reversing a conviction under a manifest weight theory "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Martin* at 175.

**{¶ 26}** Kennedy conceded at trial that he had killed R.M. but asserted that he had done so in self-defense. Kennedy argues that the State did not prove that he was at fault in creating the situation giving rise to his use of deadly force and maintains that R.M. was the initial aggressor. He also claims that the State failed to prove that he did not have a

8

bona fide and honest belief that he was in imminent danger of great bodily harm or death when he acted in self-defense or that he used excessive force to repel the attack.

{¶ 27} Kennedy also argues that the State failed to prove that he was not lawfully in a place that he had a right to be when he acted in self-defense. But this fact was not disputed at trial because both Kennedy and R.M. were on the public sidewalk at the time of the stabbing and lawfully had a right to be there. Accordingly, we focus solely on the first two elements of self-defense.

## A. The not-at-fault element of self-defense

{¶ 28} "In order to satisfy the 'not-at-fault' requirement the defendant must not have been the first aggressor in the incident." *State v. Kucharski*, 2005-Ohio-6541, ¶ 27 (2d Dist.), citing *Robbins*, 58 Ohio St.2d 74, and *State v. Melchior*, 56 Ohio St.3d 15 (1978). Based on review of the evidence, we conclude the State proved beyond a reasonable doubt that Kennedy was the first aggressor.

{¶ 29} The evidence reflects that over the course of a few hours, Kennedy got upset about the misplacement of a piece of his motorcycle helmet and turned that anger toward Stanley, and then R.M. After Kennedy equipped himself with his Amazon survival knife and motorcycle gloves, he walked in front of Stanley's house where he paced for nearly five minutes while yelling at Stanley, punching his hands into his fists, and cursing. Despite Kennedy's testimony that R.M. had nothing to do with the situation, while Kennedy was pacing in front of Stanley's home, he yelled toward her residence for R.M. to "bring his punk ass outside so we can settle it." Trial Tr. 981.

{¶ 30} When R.M. came outside wearing only boxer shorts, Kennedy said, "[W]hat's going on [R.M.]?" R.M. responded, "[W]hat's the problem?" Kennedy then asked if R.M. wanted to fight. Kennedy and R.M. started arguing as they both stood on the sidewalk in

9

front of Kennedy's and Stanley's houses where they each had a right to be present. R.M. encouraged Kennedy to hit him, but Kennedy did not. Instead, Kennedy drew his 9-inch survival knife and stabbed R.M. in the abdomen. At the time R.M. was stabbed, his hands were down by his side and visible. R.M. did not have a weapon in his hands and did not threaten that he had a weapon. Kennedy admitted that he did not see R.M. with a knife before stabbing him. Trial Tr. 914. After Kennedy stabbed R.M., Kennedy pushed R.M. to the ground. Then, while R.M. was bent over on the ground face down in the street, Kennedy stood over R.M. and punched him eight times in the back and side of his head and neck.

{¶ 31} In short, Kennedy summoned R.M. out of his home into a confrontation and then escalated it. "It is well established that a person cannot provoke a fight or voluntarily enter combat and then claim self-defense." *State v. James*, 2021-Ohio-1112, ¶ 21 (2d Dist.), citing *State v. Wallace-Lee*, 2020-Ohio-3681, ¶ 39 (2d Dist.), and *State v. Nichols*, 2002 WL 126973, *3 (4th Dist. Jan. 22, 2002). The surveillance video shows that R.M. did not attempt to strike any blow against Kennedy. Nor did R.M. threaten to attack Kennedy. Kennedy's conduct in stabbing R.M. was preemptive, not responsive. The overwhelming evidence established that Kennedy was the initial aggressor. Therefore, the jury could reasonably find that Kennedy was "at fault" in creating the situation that gave rise to his use of deadly force. Kennedy's murder conviction is therefore not against the manifest weight of the evidence.

## B. The bona-fide-belief element of self-defense

{¶ 32} The State also disproved beyond a reasonable doubt the second element of Kennedy's self-defense claim. The bona-fide-belief element of self-defense "'requires consideration of the force that was used in relation to the danger the accused believed he

10

was in.'" *State v. Rothermel*, 2014-Ohio-3168, ¶ 14 (2d Dist.), quoting *State v. Bayes*, 2000 WL 1879101, *4 (2d Dist. Dec. 29, 2000). A defendant is privileged to use only that amount of force that is reasonably necessary to repel the attack. *State v. Williford*, 49 Ohio St.3d 247, 249 (1990), citing *State v. McLeod*, 82 Ohio App. 155, 157 (9th Dist. 1948). "If the force used was so disproportionate that it shows a purpose to injure, self-defense is unavailable." *State v. Barker*, 2022-Ohio-3756, ¶ 28 (2d Dist.), citing *Wallace-Lee* at ¶ 43, quoting *State v. Macklin*, 2011-Ohio-87, ¶ 27 (8th Dist.).

**{¶ 33}** The bona-fide-belief element of self-defense "is a combined subjective and objective test." *State v. Thomas*, 1997-Ohio-269, ¶ 29. As we explained in *State v. Wheatley*, 2000 WL 145394 (2d Dist. Feb. 11, 2000):

The trier-of-fact first must consider the defendant's situation objectively, that is, whether, considering all of the defendant's particular characteristics, knowledge, or lack of knowledge, circumstances, history, and conditions at the time of the attack, [he] *reasonably* believed [he] was in imminent danger. Then, if the objective standard is met, the jury must determine if, subjectively, this particular defendant had an *honest* belief that [he] was in imminent danger. Thus, self defense is placed on the grounds of the *bona fides* of defendant's belief, and reasonableness therefor, and whether, under the circumstances, he exercised a careful and proper use of his own faculties.

(Cleaned up.) (Emphasis in original.) *Id.* at *4.

**{¶ 34}** "Self-defense claims generally involve an evaluation of witness credibility." *State v. Rhoades*, 2025-Ohio-2358, ¶ 16 (2d Dist.), citing *State v. Campbell*, 2024-Ohio-1693, ¶ 32 (8th Dist.). "The weight to be given evidence and the credibility of the witnesses are primarily decisions for the jury." *State v. Jackson*, 22 Ohio St.3d 281, 285 (1986), citing

11

*State v. DeHass*, 10 Ohio St.2d 230, 227 (1967), paragraph one of the syllabus. "[W]e will not substitute our judgment for that of the trier of fact on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way in arriving at its verdict." *State v. Sawitke*, 2025-Ohio-1089, ¶ 13 (2d Dist.).

{¶ 35} The evidence at trial disproved Kennedy's contention that he reasonably believed he was in imminent danger of death or great bodily harm. The surveillance video shows that Kennedy was angry and pacing outside of R.M.'s house for nearly five minutes before R.M. came outside. During that time, Kennedy was arguing with Stanley, cursing, and hitting his fists into his hands. Kennedy yelled for R.M. to "bring his punk ass outside so we can settle it." Trial Tr. 981. When R.M. finally came outside, he walked out to the sidewalk wearing only his underwear. R.M. did not have a knife or any other apparent weapon when he confronted Kennedy outside. There was no evidence that R.M. had any physical contact with Kennedy before he was stabbed, and both of R.M.'s hands were visible and empty next to his side when Kennedy stabbed him. Kennedy acknowledged that he did not see R.M. with a knife before he stabbed him. Immediately after Kennedy stabbed R.M., Kennedy pushed R.M. to the ground and proceeded to beat R.M. on the back of the head and neck eight times while standing over him.

{¶ 36} Although a pocketknife was recovered on scene that Kennedy claimed R.M. had on him, Stanley stated that R.M. did not carry a knife. Stanley further testified that she did not recognize the pocketknife that was recovered. However, on the night of the stabbing, Stanley told a Dayton police officer that the pocketknife belonged to Kennedy, not R.M. The State also presented surveillance video footage displaying the pocketknife in Kennedy's pants pocket throughout the evening and his introduction of it to the scene after R.M. was stabbed and punched, while R.M. was lying on the ground bleeding. When

12

Kennedy was asked on cross-examination about a silver, glittery object in his pants pocket next to his wallet chain, he identified it as "the slotted knife," meaning the pocketknife with a hole in it.   Trial Tr. 1030-1031.

{¶ 37} Even if the jury somehow believed Kennedy's testimony that R.M. had the pocketknife prior to the stabbing, the surveillance video clearly shows that R.M. did not brandish the knife or indicate he possessed the knife prior to Kennedy stabbing him.   The jury had the opportunity to hear Kennedy's version of events, his knowledge of R.M.'s prior domestic violence offenses, R.M.'s purported drug use, and other factors Kennedy allegedly took into consideration prior to stabbing R.M.   A conviction is not against the manifest weight of the evidence simply because the jury believed the State's witnesses and disbelieved defendant's testimony, which it was entitled to do.   *State v. White*, 2005-Ohio-212, ¶ 69 (2d Dist.).   "The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence."   *State v. Adams*, 2014-Ohio-3432, ¶ 24 (2d Dist.), citing *State v. Wilson*, 2009-Ohio-525, ¶ 14 (2d Dist.).

{¶ 38} Given the overwhelming evidence presented at trial, we cannot conclude that the jury lost its way when it rejected Kennedy's claim of self-defense.   This is not the exceptional case in which the evidence weighed heavily against the conviction.   Kennedy's first assignment of error is overruled.

### III.   Admission of the methamphetamine was not an abuse of discretion

{¶ 39} Kennedy's second assignment of error states:

The trial court abused its discretion when it denied Kennedy's Motion *in Limine* concerning the drugs found on his person.

{¶ 40} Prior to trial, Kennedy filed a motion in limine to prevent the admission of and testimony about the methamphetamines found in his sock on the night of the stabbing.

13

According to Kennedy, the evidence was irrelevant and unfairly prejudicial. He also argued that the evidence was inadmissible Evid.R. 404(B) evidence. The trial court denied Kennedy's motion in limine finding that the drug evidence was relevant and was not substantially outweighed by the danger of unfair prejudice. Kennedy renewed his motion at trial on the same basis, which the trial court again denied. Kennedy now argues that the methamphetamine found in his sock is "other acts testimony" prohibited by Evid.R. 404(B) and should have been excluded under Evid.R. 403(A) for being unduly prejudicial. We disagree.

{¶ 41} "A hallmark of the American criminal justice system is the principle that proof that the accused committed a crime other than the one for which he is on trial is not admissible when its sole purpose is to show the accused's propensity or inclination to commit crime." *State v. Curry*, 43 Ohio St.2d 66, 68 (1975), citing 1 *Underhill's Criminal Evidence*, § 205, at 595 (6th Ed. 1973). "Evid.R. 404 is the embodiment of that principle." *State v. Sutherland*, 2021-Ohio-2433, ¶ 8 (2d Dist.).

{¶ 42} To guard against the implication that because a person committed a crime in the past, that person committed the charged crime, Evid.R. 404(B) forbids the introduction of any evidence that the accused has committed any crime independent of the offense for which he or she is on trial to demonstrate that the defendant acted in conformity therewith at the time of the offense charged. Evid.R. 404(B)(1) states: "Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," subject to certain exceptions.

{¶ 43} Some exceptions to this rule are found in Evid.R. 404(B)(2), which provides that "other acts" or "propensity" evidence may be admissible for other purposes such as

14

"proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." "Such exceptions to the rule are made on the theory that the circumstances involved in the prior offense or offenses comprise substantial probative evidence of guilt of the particular offense in question, and the incidental fact that this same evidence proves another crime does not stand in the way of receiving such evidence for its permitted use." *State v. Hector*, 19 Ohio St.2d 167, 175 (1969). "The key is that the evidence must prove something other than the defendant's disposition to commit certain acts." *State v. Hartman*, 2020-Ohio-4440, ¶ 22. "Thus, while evidence showing the defendant's character or propensity to commit crimes or acts is forbidden, evidence of other acts is admissible when the evidence is probative of a separate, nonpropensity-based issue." *Id*.

{¶ 44} For other-acts evidence to be admissible, the court must find: (1) the evidence is relevant, (2) the evidence is not offered to prove a person's character to show action in conformity therewith but instead is presented for a legitimate purpose in accordance with Evid.R. 404(B), and (3) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice. *State v. Graham*, 2020-Ohio-6700, ¶ 72, citing *State v. Williams*, 2012-Ohio-5695, ¶ 20. "The court is precluded from admitting improper character evidence under Evid.R. 404(B), but it has discretion to allow other-acts evidence that is admissible for a permissible purpose." *Id*., citing *Hartman* at ¶ 22, citing *Williams* at ¶ 17.

{¶ 45} When exercising its discretion regarding the admission of evidence, the trial court must first determine if potential evidence is relevant. Relevant evidence is generally admissible, but irrelevant evidence is not. Evid.R. 402. To be relevant, evidence must have a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the

15

evidence." Evid.R. 401. In other words, there must be some probative value to the evidence. However, even relevant evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury. Evid.R. 402; Evid.R. 403(A).

{¶ 46} Here, the "other acts" evidence the State sought to introduce became relevant due to the nature of Kennedy's self-defense argument. According to Kennedy, R.M. was the initial aggressor and he feared R.M. because R.M. was high on methamphetamines. To counteract Kennedy's allegations, the State argued that Kennedy's use of methamphetamines contributed to his role as the initial aggressor and called into doubt his contention that he feared R.M. due to R.M.'s drug use. A responding officer with over 25 years of law enforcement experience testified that, based on Kennedy's appearance immediately after the stabbing, he appeared under the influence of methamphetamines. The officer testified that people on methamphetamine are generally erratic and excitable, their moods and behavior change quickly, and they can be exceptionally aggressive and very dangerous. The fact that Kennedy had possession of methamphetamines on his person at the time the stabbing occurred made it more probable that he was under the influence than without that evidence. Thus, the methamphetamine evidence was relevant to a material issue in dispute: whether Kennedy had a reasonable and honest belief that he was in imminent danger of death or great bodily harm.

{¶ 47} We also cannot conclude that the probative value was substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury. The State did not use the methamphetamine evidence to denigrate Kennedy's character or show he had a propensity to commit crimes. Notably, Kennedy does not explain how the admission of the drug evidence caused him prejudice at trial. Kennedy

16

testified that he had consumed other drugs on the day of the stabbing and conceded he possessed the methamphetamines, albeit for someone else. It is unreasonable to conclude the jury found Kennedy guilty of murder only because he possessed illegal drugs at the time he stabbed R.M., particularly considering the entire stabbing was captured on video. Accordingly, we cannot conclude that the trial court abused its discretion when it denied Kennedy's motion in limine concerning the illicit drugs found on his person.

**{¶ 48}** Kennedy's second assignment of error is overruled.

### IV. Trial counsel was not ineffective for failing to request a jury instruction that was not supported by the evidence

**{¶ 49}** Kennedy's third assignment of error states:

Counsel was ineffective for failing to request an inferior voluntary manslaughter jury instruction.

**{¶ 50}** We review alleged instances of ineffective assistance of trial counsel under the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *State v. Conway*, 2006-Ohio-2815, ¶ 95. "To reverse a conviction based on ineffective assistance of counsel, it must be demonstrated that trial counsel's conduct fell below an objective standard of reasonableness and that his errors were serious enough to create a reasonable probability that, but for the errors, the result of the trial would have been different." *State v. Mitchell*, 2008-Ohio-493, ¶ 31 (2d Dist.), citing *Strickland* at 688. "Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel." *Id.* at ¶ 31, citing *State v. Cook*, 65 Ohio St.3d 516, 524-525 (1992). The failure to make a showing of either deficient performance or prejudice defeats a claim of ineffective assistance of counsel. *Strickland* at 697.

{¶ 51} To establish deficient performance, Kennedy must show that his trial counsel's performance fell below an objective standard of reasonable representation. *Id*. at 688; *State v. Bradley*, 42 Ohio St.3d 136, 142 (1989). In evaluating counsel's performance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689, quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955). Therefore, "[a]n appellant is not deprived of effective assistance of counsel when counsel chooses, for strategic reasons, not to pursue every possible trial tactic." *State v. Patterson*, 2016-Ohio-2750, ¶ 15 (2d Dist.), citing *State v. Brown*, 38 Ohio St.3d 305, 319 (1988). "In Ohio, it is presumed that the failure by defense counsel to request jury instructions on lesser-included or inferior-degree offenses is a matter of trial strategy and does not establish ineffective assistance of counsel." *State v. Rider*, 2022-Ohio-1964, ¶ 65 (2d Dist.), citing *State v. Griffie*, 1996-Ohio-71, ¶ 4 (1996), and *State v. Wilson*, 2009-Ohio-1681, ¶ 421 (8th Dist.).

{¶ 52} To establish prejudice, Kennedy must show that "there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *Bradley* at paragraph three of the syllabus. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland* at 694.

{¶ 53} Kennedy argues that his trial counsel was ineffective in failing to request a voluntary manslaughter jury instruction. We do not agree.

{¶ 54} At the end of the presentation of evidence, defense counsel sought a jury instruction for involuntary manslaughter but did not seek an instruction for voluntary manslaughter. Trial Tr. 1060-1061. Counsel's decision not to request a voluntary

18

manslaughter jury instruction cannot constitute deficient performance since Kennedy was not entitled to such an instruction.

{¶ 55} Ohio's voluntary manslaughter statute provides: "No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another . . . ."  R.C. 2903.03(A). "The test for whether a serious provocation occurred and whether a defendant acted under the influence of sudden passion or in a fit of rage includes objective and subjective components."  *State v. Dixon*, 2022-Ohio-3157, ¶ 21 (2d Dist.), citing *State v. Robinson*, 2021-Ohio-3255, ¶ 12 (2d Dist.).   "The provocation must be sufficient to arouse an ordinary person beyond the power of his control, and the defendant in fact must have acted under the influence of sudden passion or in a fit of rage."  *Id.*, citing *Robinson* at ¶ 12.

{¶ 56} A growing number of courts have recognized that voluntary manslaughter is not an inferior-degree offense to felony murder as a proximate result of committing felonious assault.   *See State v. Gillilan*, 2024-Ohio-4603, ¶ 43 (2d Dist.).   Even if we assumed voluntary manslaughter was an inferior-degree offense to felony murder, a jury instruction on voluntary manslaughter would not have been appropriate in this case because the video of the incident shows nothing that would amount to serious provocation by R.M.   Nor does any other evidence in the record suggest serious provocation by R.M. that was reasonably sufficient to arouse the passions of an ordinary person beyond his or her control.   Prior to the stabbing, R.M. and Kennedy had a verbal altercation during which R.M. encouraged Kennedy to hit him.   But "words alone will not constitute reasonably sufficient provocation to incite the use of deadly force in most situations."   *State v. Shane*, 63 Ohio St.3d 630, 637 (1992).

19

{¶ 57} Moreover, Kennedy argued he acted in self-defense when he stabbed R.M. because he was afraid for his own safety. "[A] self-defense argument generally is inconsistent with a serious-provocation theory." *Dixon*, 2022-Ohio-3157, at ¶ 22 (2d Dist.), citing *State v. Brown*, 2018-Ohio-3068, ¶ 47 (2d Dist.) (citing cases). "This is so because self-defense is grounded in fear whereas voluntary manslaughter is grounded in a different emotion, a fit of passion or rage." *State v. Van Voorhis*, 2024-Ohio-1898, ¶ 36 (2d Dist.), citing *State v. Williamson*, 2011-Ohio-4095, ¶ 36 (8th Dist.). While a potential exception exists where a defendant exceeds the amount of force necessary to defend himself because he acted out of passion or rage, that is not the case here. Kennedy testified that he was afraid R.M. was going to stab him so he stabbed R.M. first. "Fear alone is insufficient to demonstrate the kind of emotional state necessary to constitute sudden passion or fit of rage." *State v. Mack*, 1998-Ohio-375, ¶ 14. "'[E]vidence supporting the privilege of self-defense, *i.e.*, that the defendant feared for his own and other's personal safety, does not constitute sudden passion or a fit of rage as contemplated by the voluntary manslaughter statute.'" *State v. Perdue*, 2003-Ohio-3481, ¶ 12 (7th Dist.), quoting *State v. Harris*, 129 Ohio App.3d 527, 535 (10th Dist. 1998). At no point did Kennedy testify that he stabbed R.M. as a result of being under the influence of a sudden passion or fit of rage. Nothing in Kennedy's testimony about what R.M. may have said or did would have led a reasonable fact finder to believe that when Kennedy stabbed R.M., Kennedy was under the influence of a sudden passion or fit of rage.

{¶ 58} Based on our review of the record, we conclude that the evidence submitted at trial did not support a jury instruction on voluntary manslaughter. Therefore, Kennedy's trial counsel was not ineffective for failing to request a jury instruction on voluntary manslaughter.

{¶ 59} Kennedy's third assignment of error is overruled.

**V.    Denial of appellant's motion for a mistrial was not an abuse of discretion**

{¶ 60} Kennedy's fourth assignment of error states:

The trial court abused its discretion when it denied Kennedy's motion for a mistrial.

{¶ 61} Kennedy contends that the trial court abused its discretion in refusing to grant a mistrial based on the prosecutor's alleged improper statements made during rebuttal closing argument.   Because a mistrial was not warranted, the trial court did not abuse its discretion in denying Kennedy's motion.

{¶ 62} Trial courts are granted great deference in determining whether to grant or deny a motion for mistrial "in recognition of the fact that the trial judge is in the best position to determine whether the situation in his courtroom warrants the declaration of a mistrial." *State v. Glover*, 35 Ohio St.3d 18, 19 (1988), citing *State v. Widner*, 68 Ohio St.2d 188 (1981).   "The granting or denial of a motion for mistrial rests in the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion."   *State v. Treesh*, 2001-Ohio-4, ¶ 73, citing Crim.R. 33 and *State v. Sage*, 31 Ohio St.3d 173, 182 (1987).   "To establish an abuse of discretion for failing to grant a mistrial, a defendant must demonstrate material prejudice."   *State v. Hanners*, 2022-Ohio-4114, ¶ 20 (2d Dist.), citing *State v. Adams*, 2015-Ohio-3954, ¶ 198.

{¶ 63} "'A mistrial should not be ordered in a criminal case merely because some error or irregularity has intervened . . . .'"   *Treesh* at ¶ 73, quoting *State v. Reynolds*, 49 Ohio App.3d 27, 33 (2d Dist. 1988).   "Mistrials need be declared only when the ends of justice so require and a fair trial is no longer possible."   *State v. Franklin*, 62 Ohio St.3d 118, 127 (1991).   In determining whether a criminal defendant was deprived of a fair trial, an

21

appellate court must determine whether, absent the error or irregularity, the jury would have found the defendant guilty beyond a reasonable doubt. *State v. Maurer*, 15 Ohio St.3d 239, 267 (1984), quoting *State v. Smith*, 14 Ohio St.3d 13, 15 (1984).

{¶ 64} Counsel for Kennedy moved for a mistrial based on prosecutorial misconduct during closing argument. "Parties are granted latitude in closing arguments, and the question as to the propriety of these arguments is generally considered one falling within the sound discretion of the trial court." *State v. Loza*, 1994-Ohio-409, ¶ 86 (1994), citing *Maurer* at 269. "The test for prosecutorial misconduct during closing arguments is whether the remarks were improper and, if so, whether they prejudicially affected the accused's substantial rights." *State v. Were*, 2008-Ohio-2762, ¶ 198, citing *Smith* at 14. We review a prosecutor's closing argument in its entirety to determine whether the allegedly improper remarks were prejudicial. *Id*. "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 220 (1982).

{¶ 65} Kennedy's assertion of self-defense relied on the contention that R.M. was high on methamphetamine at the time of the altercation. R.M. had significant medical intervention prior to his death, which included administration of controlled substances and large quantities of blood transfusions. The emergency room surgeon stated that he was "not an expert" in how the blood bank operated but assumed the blood bank screened the donated blood for drugs prior to providing it to the hospital. The coroner testified that during R.M.'s autopsy, a sample of R.M.'s blood was collected and a toxicology analysis was conducted. The toxicology results of R.M.'s blood sample from the coroner's office showed that it tested positive for methamphetamine, amphetamine (a metabolite of methamphetamine), a cocaine metabolite, and trace amounts of fentanyl and marijuana

metabolites. However, the coroner stated that the blood sample she obtained was after R.M. had undergone medical intervention and she did not know what the process was for screening donated blood. She could not state definitively whether the methamphetamine came from the donated blood.

{¶ 66} Defense counsel implored during closing argument that the methamphetamine came from R.M.'s blood, which meant that R.M. was under the influence of methamphetamine when he was stabbed by Kennedy. In particular, defense counsel made the following statements in reference to the toxicology report on R.M.'s blood collected from the coroner's office:

And then the coroner wanted to suggest we don't know what that blood looked like. Are you kidding? Do you think we get blood transfused that's full of cocaine and meth? You can be sure that they screen all blood to make sure that that blood is clean before they give it to people.

Trial Tr. 1084-1085.

{¶ 67} The prosecutor then made the following statements to counter defense counsel's closing statements:

[Y]ou can rest assured that that blood is being screened. Well, thank you. The doctor obviously couldn't rest assured because she wouldn't answer. The question is whether that was true or not. So are you going to believe a medical professional or a Public Defender? Because there's no evidence in this case that the blood of the blood bank actually is screened. I hope it is. There's no evidence that it is. And a medical doctor would not say definitively it is. When you have a medical -- when you have a medical question, I hope you call a Public Defender.

23

Trial Tr. 1109.

{¶ 68} Defense counsel objected, and a sidebar was held, during which the following was discussed:

THE COURT: Please refer to her as Defense counsel.

[Prosecutor]: Oh, I apologize.

THE COURT: Thank you.

[Defense counsel]: Can I get an instruction just to disregard that remark right away?

THE COURT: Is that really what you want to do? It came in earlier so I can correct it. I mean, I would do it if you want it. All right.

Trial Tr. 1109-1110.

{¶ 69} At the conclusion of the State's rebuttal closing argument, defense counsel requested a sidebar, and the following discussion occurred:

[Defense counsel]: Your Honor, I just wanted to make a record. Of the comments that were made in closing argument by [the prosecutor] disparaging public defenders. And I think just for the record, and at this point, I have to move for a mistrial.

THE COURT: Okay. So I don't I don't believe that the remarks were -- I would not characterize them as disparaging of public defenders, although I understand what can be conveyed. Hence the advisement that the State abided by for the remainder of the closing arguments. So I'm going to deny the motion for mistrial.

Trial Tr. 1117-1118.

{¶ 70} We are not persuaded that the prosecutor's statements in its rebuttal closing constituted a basis for a mistrial. The jury was instructed that closing arguments are not evidence. Although there was an immediate objection to the prosecutor's statements, the objection was limited to referring to defense counsel as "public defenders." The prosecutor immediately apologized and was instructed to refer to opposing counsel as defense counsel, which he did. It was not until the prosecutor had concluded his rebuttal closing argument that defense counsel moved for a mistrial "for the record."

{¶ 71} When considering the prosecutor's rebuttal closing in context, the statements the prosecutor made were in response to defense counsel's statement that the jury "could be sure" that blood is screened by the blood bank. Because Kennedy's counsel stated that blood banks screen donated blood to make sure it is clean, it was not improper for the prosecutor to comment about the issue based on the trial testimony. *State v. McAlpin*, 2022-Ohio-1567, ¶ 180 (2d Dist.).

{¶ 72} We agree, however, that the prosecutor's identification of counsel as "public defender" and his sarcastic comment, "when you have a medical question, I hope you call a Public Defender," were inappropriate and unnecessary. Nevertheless, reversible error exists "only where it is clear beyond a reasonable doubt that, absent the prosecutor's comments, the jury would not have found appellant guilty." *State v. Benge*, 1996-Ohio-227, ¶ 26, citing *Loza*, 1994-Ohio-409, at ¶ 86. Due to the overwhelming evidence establishing Kennedy's guilt, we cannot conclude that a fair trial was no longer possible when the prosecutor referred to defense counsel as a public defender and made a sarcastic comment that if a person has a medical question, that person should call a public defender. *Knuff*, 2024-Ohio-902, at ¶ 262-263. Given the evidence in this case, it is not clear beyond a

25

reasonable doubt that, absent the prosecutor's statements, the jury would not have found Kennedy guilty.

{¶ 73} The fourth assignment of error is overruled.

## VI. Cumulative Errors

{¶ 74} Kennedy's fifth assignment of error states:

Kennedy was denied Due Process of law and a fair trial due to the cumulative effect of errors by the trial court.

{¶ 75} Pursuant to the doctrine of cumulative error, "a conviction will be reversed where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of numerous instances of trial court error does not individually constitute cause for reversal." *State v. Garner*, 1995-Ohio-168, ¶ 62. However, the doctrine does not apply unless there are "multiple instances of harmless error." *Id*. "In order to find cumulative error, we must find: (1) that multiple errors were committed at trial, and (2) there is a reasonable probability that the outcome of the trial would have been different but for the combination of the separately harmless errors." *State v. Goldblum*, 2014-Ohio-5068, ¶ 58 (2d Dist.), citing *State v. Kelly*, 2005-Ohio-305, ¶ 33 (2d Dist.).

{¶ 76} Kennedy contends that the cumulative effect of errors made by the trial court during the course of the proceedings denied him due process and a fair trial. Kennedy argues "the errors included the admission of prejudicial evidence over objection, failure to declare a mistrial or admonish the jury, and trial counsel's failure to request a jury instruction on voluntary manslaughter." Appellant's Brief, p. 21. We have addressed these alleged errors in Kennedy's first four assignments of error. Based on our analysis above, we conclude that Kennedy has failed to establish any error, let alone that multiple errors were committed at trial.

26

**{¶ 77}** The fifth assignment of error is overruled.

## VII.    Present and Future Ability to Pay Financial Sanctions

**{¶ 78}** Kennedy's sixth assignment of error states:

The trial court erred when it failed to properly consider Kennedy's present and

future ability to pay financial sanctions.

**{¶ 79}** Kennedy argues that the trial court's order to pay court costs was contrary to law because the trial court did not specify at sentencing that it considered Kennedy's present and future ability to pay court costs.   According to Kennedy, he had no present or future ability to pay court costs because he was sentenced to an indefinite life prison term. Kennedy's argument is unpersuasive.

**{¶ 80}** In all criminal cases, the trial court "shall include in the sentence the costs of prosecution, including any costs under [R.C. 2947.231], and render a judgment against the defendant for such costs."    R.C. 2947.23(A)(1)(a).    "[T]his strict statutory language '*requires* a court to impose costs against all convicted defendants,' indigent or not." (Emphasis in original.) *State v. Taylor*, 2020-Ohio-3514, ¶ 6, quoting *State v. White*, 2004-Ohio-5989, ¶ 8.   Thus, courts do not need to consider a defendant's present or future ability to pay before imposing court costs.   *State v. Barker*, 2025-Ohio-56, ¶ 46 (2d Dist.).

**{¶ 81}** We acknowledge that a trial court has discretion to waive, suspend, or modify the costs that it imposed on a defendant.   *Taylor* at ¶ 1.   But Kennedy did not request that the trial court waive, suspend, or modify the court costs.   Nor did he file an affidavit of indigency with the court for purposes of sentencing.   There is no basis upon which to conclude that the court's imposition of court costs was contrary to law.   The sixth assignment of error is overruled.

## VIII.    Conclusion

{¶ 82} Having overruled the assignments of error, we affirm the judgment of the trial court.

. . . . . . . . . . . . .

TUCKER, J., and HANSEMAN, J., concur.